Ivan C. McLEOD, Regional Director of the Second Region of the National Labor Relations Board, for and on Behalf of the NATIONAL LABOR RELATIONS BOARD, Petitioner-Appellee,

v.

BUSINESS MACHINE AND OFFICE APPLIANCE MECHANICS CONFERENCE BOARD, LOCAL 459 INTERNATIONAL UNION OF ELECTRICAL, RADIO AND MACHINE WORKERS, AFL–CIO, Respondent-Appellant.

No. 243, Docket 27317.

United States Court of Appeals Second Circuit.

Argued Dec. 28, 1961.

Decided Feb. 7, 1962.

Everett E. Lewis, New York City (Abramson & Lewis, New York City, and Leonard Greenwald, Donald Grody, New York City, on the brief), for appellant.

Winthrop A. Johns, Assistant General Counsel, National Labor Relations Board, Washington, D. C. (Stuart Rothman, General Counsel, Dominick L. Manoli, Associate General Counsel, Jacques Schurre, Attorney, National Labor Relations Board, Washington, D. C., on the brief), for appellee.

Murray Gartner, New York City (Poletti, Freidin, Prashker & Harnett, New York City, Richard H. Borow, Noel B. Berman, New York City, of counsel), for charging party.

Before MOORE, KAUFMAN and MARSHALL, Circuit Judges.

MARSHALL, Circuit Judge.

This is an appeal from a district court order granting a petition for an injunction filed by a Regional Director of the N.L.R.B. pursuant to section 10(*l*) of the National Labor Relations Act, as amended.[1] The petition alleged, and the lower

---

1. 29 U.S.C.A. § 160(*l*).

That section provides in part:

"Whenever it is charged that any person has engaged in an unfair labor practice within the meaning of paragraph (4) (A), (B) or (C) of section 158(b) of this title, or section 158(e) of this title or section 158(b) (7) of this title, the preliminary investigation of such charge shall be made forthwith and given priority over all other cases except cases of like character in the office where it is filed or to which it is referred. If, after such investigation, the officer or regional attorney to whom the matter may be referred has reasonable cause to believe such charge is true and that a complaint should issue, he shall on behalf of the Board, petition any United States district court within any district where the unfair labor practice in question has occurred, is alleged to have occurred, or wherein such person resides or transacts business, for appropriate injunctive relief pending the final adjudication of the Board with respect to such matter. Upon the filing of any such petition the district court shall have jurisdiction to grant such injunctive relief or temporary restraining order as it deems just and proper, notwithstanding any other provision of law: *Provided further,* That no temporary restraining order shall be issued without notice unless a petition alleges that substantial and irreparable injury to the charging party will be unavoidable and such temporary restraining order shall be effective for no longer than five days and will become void at the expiration of such period. * * * Upon filing of any such petition the courts shall cause notice thereof to be served upon any person involved in the charge and such person, including the charging party, shall be given an opportunity to appear by counsel and present any relevant testimony."

The order enjoined Local 459 from:

"(a) Continuing its current handbilling at or in the vicinity of the premises, stores or ticket offices operated by Associated Lerner Shops of America, Inc., Macy's New York, Eastern Air Lines, American Tobacco Company, or any other customer of Remington Rand Univac Division, Sperry Rand Corporation; or

"(b) In any manner or by any means, including handbilling, threatening, coercing or restraining Associated Lerner Shops of America, Inc., Macy's New York, Eastern Air Lines, American To-

court found, there was reasonable cause to believe appellant Local 459 was engaging in conduct violative of section 8(b) (4) (ii) (B) of the Act.[2]

█ The evidence disclosed that certain members of appellant employed by Remington Rand Univac Division, Sperry Rand Corporation (Rand), as tabulating service mechanics have been on strike since September, 1961. In the course of this strike, appellant began distributing handbills at the premises of certain businesses which lease equipment, such as tabulators and computors, from Rand. Some, or perhaps all, of this equipment is serviced by Rand employees who are thus performing the struck work. One firm, Macy's Department Store, also sells consumer products produced by Rand. There is no evidence in the record to indicate whether the other businesses sell Rand products or whether their relations are limited solely to the leasing and servicing of equipment. The handbills appealed to the public not to patronize these firms.

█ The district judge found there was "reasonable cause," within the mean-

ing of section 10(*l*), to believe the handbilling violated section 8(b) (4) (ii) (B). Because there is no dispute as to the material facts in evidence and because we are faced solely with questions of law, we need decide only whether the judge below "was wrong, not whether he was 'clearly' so." Empressa Hondurena de Vapores, S. A. v. McLeod, 300 F.2d 222 (2 Cir., Jan. 12, 1962). We believe the injunction should not have been granted because previous Board decisions construing the so-called "publicity proviso" would preclude it from finding an unfair labor practice in this case. Under these circumstances, injunctive relief under section 10(*l*) cannot be granted without usurping the function of the Board and violating the congressional intent behind that provision. We must, therefore, reverse.

Prior to the enactment of section 10(*l*), federal courts were without jurisdiction to issue injunctions in "labor disputes" under the broad prohibitions of the Norris-LaGuardia Act.[3] Passed in 1932, that statute was a manifestation of strong congressional disapproval of the per-

---

bacco Company, or any other person engaged in commerce or in an industry affecting commerce, where an object thereof is to force or require Associated Lerner Shops of America, Inc., Macy's New York, Eastern Air Lines, American Tobacco Company, or any other person, to cease doing business with Remington Rand Univac Division, Sperry Rand Corporation."

2. 29 U.S.C.A. § 158(b) (4) (ii) (B). That section provides in part:
"(b) It shall be an unfair labor practice for a labor organization or its agents—
\* \* \* \* \*
"(4) \* \* \* (ii) to threaten, coerce, or restrain any person engaged in commerce or in an industry affecting commerce, where in either case an object thereof is—
\* \* \* \* \*
"(B) forcing or requiring any person to cease using, selling, handling, transporting, or otherwise dealing in the products of any other producer, processor, or manufacturer, or to cease doing business with any other person \* \* \*
\* \* \* \* \*

"\* \* \* *Provided further,* That for the purposes of this paragraph (4) only, nothing contained in such paragraph shall be construed to prohibit publicity, other than picketing, for the purpose of truthfully advising the public, including consumers and members of a labor organization, that a product or products are produced by an employer with whom the labor organization has a primary dispute and are distributed by another employer, as long as such publicity does not have an effect of inducing any individual employed by any person other than the primary employer in the course of his employment to refuse to pick up, deliver, or transport any goods, or not to perform any services, at the establishment of the employer engaged in such distribution."

3. 29 U.S.C.A. §§ 101–115.
Local 753, Milk Wagon Drivers v. Lake Valley Farm Products, Inc., 311 U.S. 91, 61 S.Ct. 122, 85 L.Ed. 63 (1940); New Negro Alliance v. Sanitary Grocery Co., 303 U.S. 552, 58 S.Ct. 703, 82 L.Ed. 1012 (1938).

formance of federal courts in labor disputes.[4] It was believed the temporary restraining order and preliminary injunction were inappropriate remedies for such use because they often settled the dispute under the guise of merely preserving the status quo.[5] Moreover, Congress believed the federal courts, through the injunctive process, had set themselves up as economic arbiters of labor strife, a function which Congress believed they were institutionally ill-equipped to undertake and which could lead only to the tarnishing of judicial prestige.[6] The Legislature believed the formulation of labor policy was essentially a political question and belonged to it.[7] The statute, therefore, "was prompted by a desire * * * to withdraw federal courts from a type of controversy for which many believed they were ill-suited and from participation in which, it was feared, judicial prestige might suffer." [8]

When Congress wrote the Taft-Hartley Act in 1947, however, it believed Norris-LaGuardia to be so broad that certain of the new provisions of section 8(b), creating union unfair labor practices, would be rendered nullities without some use of the injunctive process. Section 10(*l*), essentially a compromise measure, was enacted to fill this need. Attempts to restore power to the federal courts to issue injunctions in certain labor disputes upon petition by purely private parties were abandoned because "opposition to restoring the injunctive process * * * seemed to be so strong * * *" that other provisions of the bill were endangered.[9] One of the principal arguments employed to defeat these attempts was that the federal courts would once again become too deeply involved in labor disputes without the aid of initial adjudication by an expert agency.[10] It is against this background that section 10 (*l*) must be read.

4. The Senate report observed:
   "It cannot be successfully claimed that the courts have not written into these injunction cases a new law of labor disputes, fitting the law to each particular case, and then enforcing this new law made by the court. * * *
   "It is difficult to see how any civilized people could indefinitely submit to such tyrannical procedure. It is not difficult to understand how such cruel laws, made not by any legislature but by a judge upon the bench, should bring our Federal courts into disrepute." S.Rep. No. 163, 72nd Cong., 1st Sess. 18 (1932).

5. Frankfurter & Greene, The Labor Injunction, 201 (1930).

6. See Note 4, supra.
   In both Houses of Congress the debate over the passage of Norris-LaGuardia focused on the role of the courts. Senator Norris observed:
   "[I]t is because we have now on the bench some judges—and undoubtedly we will have others—who lack the judicial poise necessary in passing upon the disputes between labor and capital that such a law as is proposed in this bill is necessary." 75 Cong.Rec. 4510 (1932).
   "This judge-made law has developed in the past 40 years. The judges have themselves enforced the penalties for the violations of the laws made by them * * * It is because of this develop-

ment of law made on the bench that our federal courts have lost a great deal of respect." 75 Cong.Rec. 5463 (1932) (Remarks of Representative O'Connor).

7. See Notes 4 and 6, supra.
   "We are trying to reestablish a system of laws for the government of the courts. We are writing a law binding the courts to a definite course of action with reference to injunctions. We are not disturbing the government of laws but we are taking away from the courts their right to act as if they were a government of men." 75 Cong.Rec. 4509 (1932) (Representative Oliver).
   "The public policy laid down in the bill, I think, is essential, because there should be some standard by which the courts may know, at a time when they are in such confusion, what it is proper to do. I think the most fitting and, in reality, the only proper tribunal to express such a policy is the Congress." Id. at 5470 (Representative Browning).

8. Marine Cooks v. Panama S.S. Co., 362 U.S. 365, 370 n. 7, 80 S.Ct. 779, 783, 4 L.Ed.2d 797 (1960).

9. II N. L. R. B. Legislative History of the Labor-Management Relations Act, 1365 (1948) (Remarks of Senator Taft).

10. Id. at 1360-1 (Remarks of Senator Morse).

Section 10(*l*) was designed by Congress to provide a means by which temporary injunctive relief could be obtained "pending the final adjudication of the Board." Sen.Rep.No.105 (80th Cong. 1947), p. 27. H.R.Conf.Rep.No.510 (80th Cong.1947), p. 57. It does not provide relief beyond that stage, for Sections 10(e), (f) specify the procedure to be followed after the Board has rendered a decision. These sections allow temporary relief pending appeal or petition for enforcement, but only in aid of the Board order. Those attempting to upset a decision by the Board cannot obtain such relief pending their appeal. It is clear, therefore, that if the Board holds the present case does not involve an unfair labor practice, the injunction affirmed here must be dissolved forthwith, regardless of whether the charging party decides to appeal.

Because section 10(*l*) injunctions have only this limited purpose, a finding of "reasonable cause" must be premised on a belief there is a reasonable possibility of the Board sustaining the unfair labor practice charge. But previous Board decisions preclude it from finding an unfair labor practice here without reversing field, and, needless to say, there has been no showing there will be such a reversal. In Lohman Sales Co., 132 N.L.R.B. No. 67, the Board construed the words "product" or "produced," as used in the so-called "publicity proviso," to encompass all forms of labor or service and rejected a literal interpretation which would limit them to actual consumer goods. The Board further indicated it would not construe the proviso to "attach special importance to one form of labor over another." Under this interpretation, the handbilling here would be protected by the "publicity proviso." Subsequent cases have consistently adhered to this rationale [11] and have bolstered the assertion of the dissenter in Lohman that "[t]he net result of this interpretation is to sanction the indiscriminate handbilling of virtually any business."

The Regional Director, however, believes the anticipation the Board will abandon this rationale "reasonable," because, in his view, every factual situation yet ruled upon by the Board involved a "direct connection" between services provided by the primary employer and products distributed by the secondary business.[12] He contends there is no such connection here between the tabulators and computors and the products distributed by the handbilled firms.[13] We do not believe, however, the Board decisions in question allow for such a distinction. In Golden Dawn Foods, 134 N.L.R.B. No. 73, the Board was faced with two disputes involving two primary employers and one secondary business. The first dispute involved a refrigeration installation and maintenance contractor who employed non-union workers to install and service the refrigeration equipment in the secondary employer's super market. The Regional Director contends the refrigeration equipment makes cer-

---

11. E.g. Middle South Broadcasting Co., 133 N.L.R.B. No. 165.

12. In effect, the Regional Director would have us ignore what was said in Lohman as mere dictum. Even without the subsequent decisions discussed herein, we might well be hard pressed to find it "reasonable" to expect the Board to abandon a rationale recently expressed and clearly designed to govern its consideration of future cases. In any event, we do not believe the lack of a decision precisely on point is by itself sufficient to constitute reasonable cause. Penello v. Local Union No. 59, Sheet Metal Workers, 195 F.Supp. 458, 473 (D.Del.1961).

13. The Regional Director's position in this respect is not abundantly clear. He introduced no evidence to show the relations between Rand and the handbilled firms were limited solely to the leasing and servicing of equipment. Apparently he contends this factor is irrelevant because the handbills made no reference to such products. Because the Board has held in the clearest possible fashion "that the publicity proviso was intended to permit a consumer boycott of a secondary employer's entire business and not merely a 'product,'" Middle South Broadcasting Co., 133 N.L.R.B. No. 165, we believe such proof was essential to any action premised on the so-called "direct connection" test.

tain products saleable and is thereby "directly connected" with them. Even if we were able to accept this as a viable distinction, it would not dispose of the other dispute which involved an electrical contractor who did all the electrical work in the building. Here indeed was the Board's golden opportunity to expound upon the "direct connection" test, for the electricity in the building had no such connection with products distributed by the secondary employer. The Board, however, merely said handbilling in both disputes was protected by the publicity proviso "[f]or the reasons stated in the Lohman Sales case * * *". Nor has the Regional Director said why Northwestern Construction of Washington, 134 N.L.R.B. No. 46, is distinguishable on the grounds there is a "direct connection" between construction work on a building and products ultimately sold in that building.

In meeting the issues before us, we must be mindful of a key fact relating to the internal structure of the agency itself. Because the prosecutory and judicial functions have been separated within the Board,[14] the General Counsel (or his representative, here the Regional Director) acts upon his own authority in issuing unfair labor practice complaints and seeking injunctions. If the General Counsel disagrees with the Board's interpretation of the statute, there is little to stop him from continuing to issue complaints in the hope of having the Board reverse itself. The decision in Golden Dawn indicates the General Counsel in fact did seek to have Lohman overruled. Whether this is such a case or not is irrelevant, for the danger is there. While we must give great weight to a Regional Director's finding of reasonable cause, we should not usurp the functions of the Board itself in doing so. The preliminary injunction is of critical importance to participants in labor disputes, for it may have as great an effect upon the dispute as the ultimate outcome of the litigation.[15] A careless interpretation of section 10(l), therefore, may make the General Counsel and the federal district courts the actual focal points of unfair labor practice adjudications. But this is precisely the result Norris-LaGuardia and section 10(l) were designed to avoid in their deliberate minimization of the role of the courts in these matters. We must, therefore, defer to the clear purport of Board precedents, whether we believe them right or wrong,[16] and dismiss the petition.[17]

The charging party, Rand, contends the handbills distributed are untruthful and, therefore, not protected by the "publicity proviso." Because the Regional Director has not relied upon this in his petition or argument, we believe the question governed not by section 10(l), but by the Norris-LaGuardia Act. We lack jurisdiction, therefore, to grant relief. Section 10(l) is operative only upon the filing of a petition by a Regional Director of the Board. This limitation was imposed in order to restrict the potential

14. See generally 2 Davis, Administrative Law §§ 13.01–13.11 (1958).

15. The present case is almost a classical example of this. The injunction, coming at the peak of the Christmas season, prevented handbilling at the very time it would have its greatest effect. Our reversal, however, cannot restore the parties to the power relationship existing at that time.

16. We express no opinion as to the conflicting interpretations of the statute delineated in Lohman or as to the proper disposition by the Board of the present case. Our decision is limited solely to the role of federal judges issuing injunctions under section 10(l). These other issues may be appropriately determined only under section 10(e) and (f).

17. We do not hold a district court's sole inquiry under section 10(l) is whether anticipation of Board relief is reasonable. We say only that in the absence of such a finding, no relief is obtainable. Having made such finding, however, the court must further find reasonable cause to believe that a Board decision finding an unfair labor practice will be enforced by a Court of Appeals. Conversely, the Regional Director must demonstrate some support, both factual and legal, for every element of his case.

involvement of federal courts in labor disputes. For that reason, we do not read it to allow consideration of issues not raised by the Regional Director. To do otherwise would not only increase the danger of over-involvement on the part of the federal courts but would also ignore the expertise which section 10(*l*) commands us to attribute to the Regional Director. It is his view of the facts and law the district judge is to evaluate in a section 10(*l*) proceeding.[18] The courts are not free to roam at will over every aspect of a labor dispute upon the request of the charging party. We are mindful of the fact the statute allows the charging party to appear by counsel and present relevant testimony. We believe, however, the principal role in these proceedings is to be played by the Regional Director acting in the public interest, and while the charging party is free to aid him in the course of the litigation, the charging party may not substitute itself as the principal complainant. The reversal here is not a bar to a further petition based upon the alleged untruthful nature of the handbills. The only relief available, of course, would be the enjoining of handbills which are untruthful, not, as the charging party seems to contend, an injunction against all handbilling.

Reversed.

LEONARD P. MOORE, Circuit Judge (dissenting).

The facts briefly stated disclose that the charging party, Remington Rand Univac Division, Sperry Rand Corporation (Remington) manufactures, sells and leases electronic computer systems and tabulating machines. These machines are for the most part used in the accounting departments of their customers. In the present case, the customers are the lessees of the machines. Under the contract of lease, they are entitled to servicing thereof by employees of Remington. The customers in New York City here involved are American Tobacco Company, a manufacturer and seller of cigarettes and other tobacco products, R. H. Macy & Co., Inc., a large department store, Associated Lerner Shops of America, Inc., women's apparel and Eastern Air Lines, Inc., a commercial air transport company.

Commencing on or about September 20, 1961, Local 459, whose members were employed by Remington to service the leased machines went out on strike against Remington. Thereafter secondary picketing against many of Remington's customers was enjoined (McLeod v. Local 459, 61 Civ. 3685, S.D.N.Y., November 24, 1961). Enjoined from picketing, Local 459 on or about December 4, 1961, attempted to achieve a general consumer boycott by the public of the above-named customers by distributing handbills in front of or near such customers' premises.

Local 459 does not claim that any of Remington's lessees sold or distributed Remington's tabulating equipment. Therefore, it could have had but one purpose in seeking to damage the business of Remington's customers, namely, to coerce the customer to discontinue its business relationship with Remington.

Local 459 contends primarily that the distribution of handbills comes within the exception of Section 8(b) (4) (ii) (B) of the National Labor Relations Act, as amended, 29 U.S.C.A. § 150 et seq., which would permit it to "truthfully" advise the public that a product produced by an employer in dispute with a union is being distributed by another employer.

Turning to the handbills themselves, they must be read as they are intended to be read by the passerby who accepts one. Common experience justifies the conclusion that they receive a quick glance at the largest type and, thereafter, become litter on the sidewalk. The impression from the glance is that there is labor trouble within the ranks of the store or office in front of which the hand-

---

18. The district judge in this case was aware of these restrictions and made no findings as to whether the handbills were untruthful.

bills are being distributed. The large type, first visible, asks the public not to buy "AMERICAN TOBACCO PRODUCTS * * *" "BECAUSE: AMERICAN TOBACCO CO. USES STRIKE BREAKERS TO SERVICE REMINGTON RAND TABULATORS * * *"; "LERNER'S PERMITS STRIKE BREAKERS TO SERVICE * * *"; and Macy's "USES STRIKE BREAKERS TO SERVICE * * *." Nothing in the handbill requests the public not to buy Remington tabulators because, concededly, none of the customers sold or distributed such machines. Furthermore, there is a clear implication that the strikebreakers are the employees of American Tobacco, Lerner's, etc., and that these companies employ the strikebreakers. The handbills are thus deceptive and misleading and fail to come within the statutory words "truthfully advising." Local 459, moreover, fails to come within the exception in that the product, i. e., the tabulator, is not distributed by Remington's lessees. It is, therefore, not entitled to the benefit of the exceptive provisions of Section 8(b) (4) (ii) (B).

Local 459 also contends that the district court's order abridges its freedom of speech (Constitution, First Amendment). Freedom of speech, however, does not include words or utterances "in furtherance of unfair labor practices" (International Brotherhood of Electrical Workers v. N.L.R.B., 341 U.S. 694, 704, 71 S.Ct. 954, 95 L.Ed. 1299 (1959)).

The district court held a hearing before making its order. "On appeal from the discretionary action by the Director and the District Court, this Court is limited to the question whether the District Court was or was not reasonable in concluding that the Director had cause to believe that the charges were true." (Douds v. Milk Drivers & Dairy Employees Union, 2 Cir., 1957, 248 F.2d 534, 537.)

It is all very well to review the Congressional debates in 1932 which preceded the passage of the Norris-LaGuardia Act but thirty years have elapsed since then. The abuse of secondary boycott practices was responsible for certain provisions in the Taft-Hartley Act (1947). Restraints against such activities were continued, not relaxed, in the Landrum-Griffin Act (1959).

To say that this case is "governed not by section 10(l), but by the Norris-LaGuardia Act" is little different from relying on a statute that has been repealed. If technicality of pleading is to be the justification for this position, reference might be made to the countless cases in this circuit where deficiencies in pleading have always yielded to the issues actually litigated on the trial. The claim that the petition did not put in issue the untruthful, deceptive and misleading character of the handbills can result only from a failure to have read the petition and the record. The handbills were attached to the petition and the trial court specifically dealt with their misleading character. Therefore, in my opinion, the decision of the majority is just about thirty years out of date and completely disregards the statutory amendments during that period.[1]

1. I would like (also by footnote) to suggest an answer to the majority's footnote 15 because I am personally somewhat shocked by its implications. It criticizes the granting of the injunction because it "coming at the peak of the Christmas season, prevented handbilling at the very time it would have its greatest effect." I would agree were the statement changed to "greatest economic effect against innocent third parties which were non-participants in the labor dispute between Remington and its employees." At a time when department store merchants were hoping to have many potential customers pass through their doors, the union sought to steer these customers away by giving the impression that there was labor trouble within the ranks of the companies, the stores and the offices which were the victims of the handbilling demonstration. To regret, as does the majority, that their reversal "cannot restore the parties to the power relationship existing at that time" is an expression of sympathy ill-directed. Who are the "parties"? Certainly not the merchants whose only con-

From a procedural point of view, we have indeed reached a new appellate status when we tell the Labor Board how they must decide a case which has not, as yet, been heard by them. There will be no need in the future for Board hearings and decisions in section 10(*l*) injunction cases. Upon appeal from a preliminary injunction, we will merely look over the Board's decisions in other situations regardless of whether they appear to be sound or have any likelihood of enforcement and tell them that we find that their previous decisions "would preclude it from finding an unfair labor practice in [the] case."

The majority holds that "injunctive relief under section 10(*l*) cannot be granted without usurping the function of the Board" and straightway proceeds to usurp the Board's function of hearing and deciding the case. In one breath they say that section 10(*l*) was designed to provide temporary injunctive relief "pending the final adjudication of the Board" and in the next they decide not to let the Board have this Congressionally bestowed privilege because they think the Board would thereby be "reversing field." They do not explain how they reach their conclusion that "there has been no showing there will be such a reversal." There scarcely could be a decision one way or the other before the Board has even heard the case. Therefore, I am completely baffled by their pronouncement that, "While we must give great weight to a Regional Director's finding of reasonable cause, we should not usurp the functions of the Board itself in doing so." And then they immediately "usurp." Nor can I reconcile their statement that the Board is precluded "from finding an unfair labor practice here" with the footnote 16 statement that they express no opinion "as to the proper disposition by the Board of the present case."

In final analysis, it is the function of the courts to construe the Act (N. L. R. B. v. Waterman S. S. Corp., 309 U.S. 206, 60 S.Ct. 493, 84 L.Ed. 704 (1940)). To predict that the Board is bound to decide this case in favor of Local 459 would be unwarranted speculation. Our function at this time is to pass upon the reasonableness of the district court's restraining action. I cannot believe that Board or court should allow handbilling of such a patently deceptive and misleading nature to continue pending ultimate decision.

The relief granted was just and proper and within both the letter and the spirit of the Act. Its very purpose was to prohibit the type of activity practiced here. Injunction was necessary to protect Remington and its customers against a violation of the Act and from irreparable damage.

The order, in my opinion, should be affirmed.

---

nection with Remington Rand was the rental of tabulating machinery used in their accounting departments. The sole purpose of "secondary boycott" legislation was to keep the "power relationship" where it properly belonged, namely, between the employer and the striking employees and away from the doors of the company wholly unconnected with the dispute. In my opinion, this decision is court approval of a flagrant abuse of "power."