Harold A. BOIRE etc., Petitioner-Appellee,

v.

**INTERNATIONAL BROTHERHOOD OF TEAMSTERS, CHAUFFEURS, WAREHOUSEMEN & HELPERS OF AMERICA, etc., Respondents-Appellants.**

No. 73-1003.

United States Court of Appeals, Fifth Circuit.

May 8, 1973.

Rehearing and Rehearing En Banc Denied June 15, 1973.

L. N. D. Wells, Jr., Dallas, Tex., Frank E. Hamilton, Jr., Tampa, Fla., Gerry M. Miller, Milwaukee, Wis., for respondents-appellants.

Charles Deal, Counsel for the Gen. Counsel, Joseph V. Moran, Regional Atty., N. L. R. B., Region 12, Tampa, Fla., Julius Serot, Sp. Counsel to the Gen. Counsel, Peter G. Nash, Gen. Counsel, Marvin Roth, Supervisory Atty., N. L. R. B., Washington, D. C., for petitioner-appellee.

Granville M. Alley, Jr., Tampa, Fla., for Pilot Freight Carriers, Inc., amicus curiae.

Before RIVES, GOLDBERG and MORGAN, Circuit Judges.

GOLDBERG, Circuit Judge:

Section 10(j) of the N.L.R.A., 29 U.S.C. § 160(j) authorizes the District Court to grant temporary injunctive relief when unfair labor practices are pending before the N.L.R.B. when such relief would be "just and proper." In this appeal we are asked to review the propriety of a temporary injunction granted by the District Court pursuant to § 10(j). Appellants, the International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers and several of its affiliated locals ["Teamsters" or "Union"] argue that the injunctive relief that had been granted at the request of appellee Boire, the N.L.

R.B. regional director, was not proper because the District Court did not have "reason to believe" that the Union was committing unfair labor practices as is required by § 10(j). We affirm.

## I. BACKGROUND

### A. *Factual Background*

Pilot Motor Freight Carriers, Inc. ["Pilot"] [1] is a motor carrier of general commodity freight with its principal offices in Winston-Salem, North Carolina. It is engaged in the business of transporting freight by motor vehicles pursuant to authority granted by the Interstate Commerce Commission ["ICC"] over routes extending from New England to the Florida Keys and as far west as Ohio. Pilot lacked authority to operate its lines in Florida until August, 1970, at which time, after five years of litigation, the ICC granted Pilot authority to extend its lines south to Florida. Within two months after receiving ICC authorization, Pilot opened Florida terminals in Jacksonville, Tampa, Hollywood and Orlando, which, when linked up with the pre-existing line, gave Pilot an integrated north-south line extending the length of the Eastern seaboard. The Florida terminal nearest to the pre-existing Pilot unit was in Jacksonville, some 260 miles from the Pilot terminal in Charleston, South Carolina.

Since 1964, Pilot has been a signatory to the National Master Freight Agreement ["NMFA"], which is a collective bargaining contract periodically negotiated and renewed by the Teamsters Union and a multi-employer association of which Pilot is a member. The relevant NMFA is the current one, which is effective from April 1, 1970, through June 30, 1973. This agreement covers approximately 450,000 Teamster employees of hundreds of freight industry employers, including Pilot, in a single, national multi-employer bargaining unit. Approximately 1800 Pilot employees outside of Florida are covered by the NMFA.[2]

Included in the NMFA are the following provisions pertinent to this appeal:

(1) The NMFA covers "all operations of the employer." (Art. 2, § 1).

(2) The only exclusions from the system-wide national unit are "those operations . . . where the employees are covered by a collective bargaining agreement with a union not a signatory" to the NMFA or those employees who have not designated a signatory union as their collective bargaining agent. (Art. 2, § 3).

(3) "The provisions of this Agreement shall apply to all accretions to the bargaining unit, including, but not limited to, newly established or acquired terminals and consolidation of terminals." (Art. 2, § 3).

(4) An extensive grievance procedure provides for arbitration of all contractual disputes with all awards being "final and binding" on the parties. (Art. 8).

Since late 1970, Pilot has operated the Florida terminals with approximately 140 non-supervisory personnel working in the job classifications of over-the-road truck drivers, local city pick-up and delivery truck drivers, and dockworkers. Unlike its terminals outside of Florida, Pilot does not directly employ the drivers and dockworkers in its Florida terminals. Rather, it uses owner-operator truck drivers and dockworkers who are employed by independent labor contractors, not by Pilot. It suffices to say that as a result of not having to employ or deal directly with its Florida workers, Pilot is able to pay them less and require more of them than it does with the unionized employees in the Pilot system outside of Florida. It is the Team-

1. Pilot is not a formal party to the instant proceeding but did appear before this Court as *amicus curiae* urging affirmance.

2. All of the Pilot terminals outside of Florida are represented by the Teamsters with the exception of one at Lynchburg, Virginia, where the Teamsters have failed to demonstrate majority status.

sters' attempt to represent Pilot's Florida workers that is at the heart of this lawsuit.

## B. *Procedural Background*

Pilot operated the Florida terminals without Teamster intervention for almost 18 months in the above described non-union manner. On April 7, 1972, a series of events began that lead to the case *sub judice*. Within four months after April 7, 1972, the question of whether the Teamsters are entitled to represent Pilot's Florida employees was brought to litigation almost simultaneously in three separate forums: (1) an arbitration proceeding, (2) a Board unit clarification proceeding, and (3) an unfair labor practice proceeding. Each of these proceedings may be summarized briefly.

1. *Arbitration.* On April 7, 1972, the Union filed grievances pursuant to the NMFA claiming that the Florida operation was an accretion to the bargaining unit and that therefore, under the contract, the Teamsters were entitled to represent the Florida employees. The Union's grievance was taken to arbitration before the Southern Area Multi-State Grievance Committee and hearings were held on June 20–22. The Multi-State Committee rejected Pilot's motion to defer ruling on the grievance pending a determination by the N.L.R.B. in a unit clarification proceeding that had been filed by Pilot on May 24, 1972. On July 22 the Committee decided that Pilot's Florida operation was "covered by the terms and conditions of the NMFA and the applicable Area Supplements."

On July 16, 1972, the Union commenced strike activity to compel Pilot to comply with this award. The strike continued until July 28, at which time it was enjoined by a federal district court in North Carolina [3] on the ground that the parties had not exhausted the contractual grievance procedures. Follow-

ing this ruling, the grievance was heard on August 18 by the National Grievance Committee, the final arbiter of disputes under the NMFA. On August 21, the National Grievance Committee rendered its decision in favor of the Teamsters. The decision, delivered in the form of a letter, stated:

"Gentlemen:

"Please be advised that the National Grievance Committee, on August 18, 1972, adopted a motion that after reviewing the presentation of the parties and the negotiating intent, to interpret Article 2, Section 3, in the context of Articles 1 and 2 and the balance of the National Master Freight Agreement, so as to apply the provisions of the Southern Conference Road and City Supplemental Agreements to the contiguous territory and operations of Pilot Freight Carriers, Inc., included in the Public Convenience and Necessity Authority granted by the ICC in Docket No. MC—61264 SUB 16.

"This interpretation shall apply to all similar cases, and any dispute with regard to similarity shall be presented as a factual grievance through the regular grievance procedure."

On September 8, 1972, the North Carolina District Court dissolved its July 28th injunction after finding that the Committee's award "is endowed with sufficient clarity to be enforceable and fulfills the requirements of the mandatory grievance procedures contained in the NMFA." Pilot Freight Carriers, Inc. v. International Brotherhood of Teamsters, Chauffeurs, Warehousemen & Helpers of America, M.D. N.C., 1972, 353 F.Supp. 869, 871. The Court explicitly refused to decide whether the Committee's award was valid under the N.L.R.A. and deferred to the Board on that issue, taking notice of the unfair labor practice proceedings pending before the Board at that time.[4]

3. The injunction was issued in a § 301 suit brought by Pilot to enjoin the strike until arbitration had been completed.

4. "To which phases, if any, of plaintiff's Florida operations the decision of the Committee may be applied without constituting an unfair labor practice is not

2. *Unit Clarification Proceeding.* On May 24, 1972, after the contractual grievance had been filed but prior to the hearing on the grievance, Pilot filed a unit clarification petition with the Board's Regional Office in Tampa, Florida. The petition sought to have the Board "clarify the national unit to exclude any and all Pilot employees in the State of Florida." Six days of hearings directed solely to the accretion question were held before the Regional Director in June. On July 12, the Regional Director transferred the matter to the N.L.R.B. in Washington, D. C. for decision. On August 11, the Board, unwilling or unable to decide the accretion question, remanded the case to the Regional Director in order to have further evidence taken on the issue of the status of the Florida employees as employees of independent contractors. Hearings resumed before the Regional Director on September 20, and since that time, some forty days of hearings have been held. The unit clarification proceedings, to the best of our knowledge, are still in progress.

3. *Unfair Labor Practice Proceedings.* On July 29, 1972, with both the contractual grievance and the unit clarification proceedings under way, Pilot filed unfair labor practice charges with the Board alleging that the Teamsters' attempts to gain representation of the Florida workers constituted a violation of § 8(b)(1)(A) of the N.L.R.A. The charged violation derived from the allegations that the Teamsters were coercing, restraining and interfering with the § 7 rights of the Florida workers by attempting to enforce an invalid accretion clause.

On August 9, 1972, Pilot filed additional charges alleging that the Teamsters' activities also constituted viola-

tions of § 8(b)(3) of the Act, which refers to the Union's obligation to bargain with Pilot. On September 6, the Board consolidated the two charges and issued a complaint and notice of hearing. Hearings on the unfair labor practice charges commenced before an Administrative Law Judge on October 11. On October 12, the Administrative Law Judge recessed the hearing *sine die* pending the outcome of the unit clarification proceeding. On October 18, Pilot filed a motion to consolidate the unit clarification and unfair labor practice proceedings. This motion was denied by the Board on November 9.

## II. THE INSTANT PROCEEDINGS

On September 15, after the grievance award had been rendered by the National Committee and the North Carolina federal injunction dissolved, the Teamsters notified Pilot that it would resume strike activity unless Pilot complied with the award and recognized the Teamsters as bargaining representative of its Florida employees. At this time the unit clarification and the unfair labor practice proceedings were both pending before the Board.

In order to protect the Board's jurisdiction over these matters, on September 19, 1972, the Regional Director instituted this proceeding pursuant to § 10(j) of the N.L.R.A. in Federal District Court in Florida. The action sought a court order enjoining the Teamsters from taking any action to enforce its arbitration award. Section 10(j) specifically authorizes the Regional Director to apply to the District Court for a temporary injunction in unfair labor practice cases where it is necessary to preserve the status quo while the Board procedures are in operation.

a matter to be determined by this Court. Counsel for both the plaintiff and the defendant candidly admitted in their oral arguments that charges of unfair labor practices were pending before the National Labor Relations Board in Florida, concerning the defendant's contentions, subsequently approved by the

Committee. Counsel likewise candidly and properly maintained the position that charges of unfair labor practices are within the jurisdiction of the NLRB (29 U.S.C.A. § 141 et seq.) and not within the jurisdiction of this Court." 353 F.Supp. at 872.

## A. *The Decision Below*

After a hearing on September 29, 1972,[5] in which all parties were afforded full opportunity to present evidence bearing on the issues and to argue the evidence and the law, the District Court ruled that a § 10(j) injunction should issue. Its oral findings of September 29 were supplanted by written findings and conclusions filed on October 18. The District Court found:

"(i) Since on or about April 7, 1972, and continuing to date, Respondents have insisted and demanded, and continue to insist and demand, that Pilot apply the current National Master Freight Agreement to those individuals and/or employees working in the job classifications of over-the-road drivers, city pick-up and delivery drivers and dockworkers working at the truck terminals of Pilot in the cities of Hollywood, Jacksonville, Orlando and Tampa, Florida, by the following acts and conduct:

"(1) Respondents, on or about April 7, 1972, filed grievances charging that Pilot had violated the National Master Freight Agreement by failing and refusing to apply the provisions of that agreement to the individuals working at Pilot's Florida terminals, which grievances resulted in an award issued on or about June 21–22, 1972, by the Southern Area Multi-State Grievance Committee holding that the terms and provisions of the National Master Freight Agreement and its applicable Supplemental Agreements were applicable to Pilot's Florida operations.

"(2) From on or about July 16, to on or about July 28, 1972, Respondents struck Pilot systemwide, and during the same period of time, struck and picketed Pilot's Florida truck terminals, including the terminals located in Jacksonville, Orlando and Tampa, Florida, all which locations are within the Middle District of Florida.

"(3) In a letter dated September 15, 1972, signed by an agent of Respondents, Walter W. Teague, Respondents threatened to again strike Pilot after September 20, 1972, if Pilot did not comply with the arbitration award rendered by the National Grievance Committee on August 21, 1972, holding that the terms and provisions of the National Master Freight Agreement and its applicable Supplemental Agreements applied to the individuals and employees working at Pilot's truck terminals in Florida.

"(j) At no time have Respondents, collectively or individually, offered Pilot proof of representation of a majority of the persons and individuals working at Pilot's Hollywood, Jacksonville, Orlando and Tampa, Florida, truck terminals.

"(k) The acts and conduct of Respondents set forth in Finding of Fact 4(i) above, occurring in connection with 4(j), and with the operations of Pilot, have a close, intimate, and substantial relation to trade, traffic, and commerce among the several States, and tend to lead to and do lead to labor disputes burdening and obstructing commerce and the free flow of commerce.

"5. It may fairly be anticipated that, unless enjoined, Respondents will continue and repeat the acts and conduct set forth in Finding of Fact 4(i) above, or similar or like acts and conduct."

The Court's legal conclusions were:

"1. This Court has jurisdiction of the parties and the subject matter of this proceeding, and under Section 10(j) of the Act is empowered to grant injunctive relief.

---

5. The District Court granted a T.R.O. against the Teamsters on September 21 which remained in effect until the September 29 hearing.

"2. There is, and Petitioner has, reasonable cause to believe that:

"(a) Respondents are labor organizations within the meaning of Sections 2(5) and 8(b) of the Act.

"(b) Pilot Freight Carriers, Inc. is engaged in commerce within the meaning of Section 2(6) and (7) of the Act.

"(c) Respondents have engaged in unfair labor practices within the meaning of Section 8(b)(3) and Section 2(6) and (7) of the Act, and a continuation of these practices will impair the policies of the Act as set forth in Section 1(b) thereof.

"3. To preserve the issues for orderly determination as provided in the Act, it is appropriate, just and proper that injunctive relief be granted pending final disposition of the issues of fact and law before the Board in the unfair labor practice proceeding."

The District Court explicitly refused to decide whether the § 8(b)(1)(A) charge was substantial and therefore did not determine whether the Regional Director had "reasonable cause" as to that charge.

In its order the District Court enjoined the Union from:

"(i) Insisting or demanding, or in any manner or by any means, except by processes of the NLRB, forcing or requiring Pilot Freight Carriers, Inc. to recognize and bargain with Respondents, collectively or individually, as the exclusive bargaining agent of any individual or employee working in the job classifications of over-the-road truck drivers, city pickup and delivery truck drivers, and/or dock workers at terminals of Pilot Freight Carriers, Inc., in the State of Florida as part of the existing collective bargaining unit set out in the current National Master Freight Agreement.

"(ii) Filing grievances, or in any manner invoking the arbitral machinery of the National Master Freight Agreement and/or enforcing or attempting to enforce or giving any effect to any previous or future arbitration award where in either case an object thereof is to force or require Pilot Freight Carriers, Inc. to recognize and bargain with Respondents, collectively or individually, as the exclusive bargaining agent of . . . [Pilot workers in Florida].

"(iii) Striking, picketing, or engaging in any work stoppage, or threatening to strike, picket or engage in any work stoppage, or inducing or encouraging any employee or individual to engage in any work stoppage at any terminal or facility of Pilot Freight Carriers, Inc., or at any other location, where in either case an object thereof is to force or require Pilot Freight Carriers, Inc. to recognize and bargain with Respondents, collectively or individually, as the collective bargaining agent of . . . [Pilot workers in Florida]."

B. *Issues on Appeal*

The Teamsters bring this appeal from the entry of the above order alleging that "the District Court lacked reasonable cause to believe that the Union violated § 8(b)(3);" the District Court lacked jurisdiction under the Norris-LaGuardia Act to enter the injunction;[6] and that an injunction should not issue under § 10(j) in situations where the unfair labor practices are "based on a novel legal theory running counter to prevailing law of the Board and the Supreme Court."

We first discuss the appropriate standards for issuing § 10(j) injunctions and then analyze the reasons why the Regional Director's petition was sub-

6. Inasmuch as we find the unfair labor practice charges to be substantial, legitimate, and non-frivolous, we need not pass on the Teamsters' claim that this is an injunction sought only to protect the unit clarification proceedings, which, as such, is violative of the Norris-LaGuardia Act.

stantively sufficient to meet these standards.

## III. SECTION 10(j)

A. *Standards for Issuance of a § 10(j) Injunction by the District Court*

Section 10(j) of the N.L.R.A. provides:

"(j) The Board shall have power, upon issuance of a complaint as provided in subsection (b) of this section charging that any person has engaged in or is engaging in an unfair labor practice, to petition [any district court of the] United States (including the District Court of the United States for the District of Columbia), within any district wherein the unfair labor practice in question is alleged to have occurred or wherein such person resides or transacts business, for appropriate temporary relief or restraining order. Upon the filing of any such petition the court shall cause notice thereof to be served upon such person, and thereupon shall have jurisdiction to grant to the Board such temporary relief or restraining order as it deems just and proper."

■■ The words of this section are unquestionably vague and provide little help to the District Court. Assuming, as we must, that § 10(j) does not authorize the Regional Director to seek an injunction in *every* unfair labor practice case, it is necessary to look beyond the words of the statute for guidance. Such guidance is readily available in the legislative history and the judicial decisions under both § 10(j) and § 10(*l*).[7] Essentially, the relevant authority mandates two prerequisites before an injunction is appropriate. First, there must be some showing that the injunction is equitably necessary, and second, the Board must have ·"reasonable cause" to believe unfair labor practices are actually taking place. Neither of these prerequisites has been authoritatively delimited; however, existing precedents convince us that the injunction was proper in this case.

■■ 1. *Need for Temporary Equitable Relief.* Section 10(j) directs the District Court to issue a temporary injunction in circumstances where it would be "just and proper." The Circuits have been somewhat unclear in determining the degree and type of equitable need that must be alleged in order for the temporary injunction to issue,[8] and the only time the Supreme Court attempted to clarify the apparent confusion the case became moot prior to decision.[9]

Applying the facts of this case to the rather muddled body of law dealing with the level of need for injunctive relief that the Board must show, we have no difficulty finding that the Regional Director has met his burden under even the most stringent standard. It is clear that if the Teamsters are permitted to

7. Section 10(*l*) of the Act provides that the Regional Director *shall* petition for temporary injunctive relief where he has reasonable cause to believe there are violations of the secondary boycott provisions of the Act. Unlike § 10(j), the Regional Director need not wait for the unfair labor practice complaint to issue; it is enough that reasonable cause to believe a violation exists and a complaint "should issue." For purposes of determining when a finding of "reasonable cause" should be reviewed the two sections are identical. *See generally* Note, The Role of the Temporary Injunction in Reforming Labor Law Administration, 8 Col.J. of Law & Soc.Prob. 553 (1972); Note, Temporary Injunctive Relief Under Section 10(*l*) of the Taft-Hartley Act, 111 U.Pa.L.Rev. 460 (1963). Note, Temporary Injunctions Under Section 10(j) of the Taft-Hartley Act, 44 N.Y.U.L.Rev. 181, 187 (1969).

8. *See* Note, 44 N.Y.U.L.Rev. 181, *supra* note 7. *See generally* Siegel, Section 10(j) of the National Labor Relations Act: Suggested Reforms for an Expanded Use, 13 B.C.Ind. & Comm.L.Rev. 457 (1972).

9. McLeod v. General Electric Co., S.D.N.Y. 1966, 257 F.Supp. 690, rev'd, 2 Cir. 1966, 366 F.2d 847, stay granted, 87 S.Ct. 5, 17 L.Ed.2d 45 (Harlan, J.), vacated as Moot, 1967, 385 U.S. 533, 87 S.Ct. 637, 17 L.Ed.2d 588. *See* Note, 44 N.Y.U.L. Rev. 181, *supra*, note 7.

carry forward their strike threat, one of two results will obtain. If the Company decides to resist the arbitration award and await the final determination of the Board in the pending cases, there will be wide-spread strike activity against the Pilot system,[10] which quite clearly would result in severe financial loss to the Company as well as a significant decline in important public services.

If, on the other hand, the Company succumbs to the Union pressure and complies with the arbitration award by recognizing the Union, it seems altogether clear that the Board's primary jurisdiction over this representational matter would effectively be ousted. The notoriously glacial immobility of the Board could easily drag the unit clarification out for a year or more, and by that time, the Teamsters would invariably be able to get a toe-hold on the Florida operation that would prove most difficult to overcome even if the Board ultimately decided that accretion is improper and that the Teamsters' efforts to enforce the award constituted an unfair labor practice. In these circumstances the Board's processes would be of little avail to either the Florida employees whose § 7 rights will, for all practical purposes, have been denied, or to the Company which will have been forced to bargain with an inappropriate unit. The Teamsters themselves implicitly recognize the fact that an eventual adverse Board ruling "might be met with a *fait accompli*" if the injunction is not preserved. It is precisely such an occurrence that § 10(j) was designed to prevent.

■ ■ The Union also argues that since the NMFA has been authoritatively construed to require the accretion, the only way the "status quo" can properly be maintained prior to ultimate Board resolution is to permit the Teamsters to have the benefit of their bargain and not enjoin enforcement of the award. This argument misconceives the thrust of the unfair labor practice proceeding.

The foundation of the unfair labor practice is the contention that a contractual accretion is, in this case, *illegal*. If the General Counsel ultimately prevails in the pending proceeding, the Teamsters' "bargain" would be invalid and unenforceable. Since the Board's legal theory is substantial and not frivolous, we must at this time treat the bargain as one with an illegal objective. Since the function of the § 10(j) injunction is to protect the Board's processes, it would be improper to ignore the fact that the Teamsters' version of the "status quo" is potentially illegal.

While it is clear that both Pilot and the Florida workers will suffer irreparable harm if the injunctive relief is not granted and the General Counsel ultimately prevails, we find little merit in the Teamsters' protestations that they will be irreparably harmed if the injunction is sustained. If the Teamsters ultimately prevail and the Board upholds the accretion as proper, the only loss suffered by the Union will have been the right to represent the Florida workers during the pendency of the Board proceedings. On the other hand, if the Board rules against the accretion, the Teamsters will have lost nothing to which they were lawfully entitled as a result of the temporary injunction.

■ Finally, we believe that in terms of the pending unfair labor practice proceedings, the status quo is best served by staying the Teamsters' hand and leaving the status of the Florida workers as they have always been—non-union. If parties had absolute power to determine their units by contractual means, the Teamsters' argument would have merit. Congress, however, has wisely given the Board primary jurisdiction over unit determinations, and in giving effect to the "status quo," we cannot lose sight of the fact that the unit has always been subject to the Board's approval and is not finalized simply because the arbitrator decided

10. See the District Court's Fact Finding No. 5 quoted in the text of this opinion, *supra*.

that Pilot agreed to the accretion in the contract.

■ We reject the Teamsters' argument that we can only preserve the status quo by allowing the Union to be forced upon a group of employees who have heretofore resisted all the Teamsters' organizational efforts. In sum,— protection of the Board's jurisdiction; preservation of § 7 rights of the Florida workers; and protection of the public interest from a widespread decline in Pilot's services—all militate towards the issuance of a temporary injunction. Without deciding whether the Regional Director's cause must always be this compelling in order for an injunction to be "just and proper," it is clear that the District Court has not abused its discretion in its decision that equitable relief was necessary. *See generally* Retail, Wholesale & Dep't Store Union, AFL–CIO v. Rains, 5 Cir. 1959, 266 F.2d 503; Angle v. Sacks, 10 Cir. 1967, 382 F.2d 655; Minnesota Mining & Manuf. Co. v. Meter, 8 Cir. 1967, 385 F.2d 265; Madden v. International Org'n of Masters, Mates & Pilots, 7 Cir. 1958, 259 F.2d 312.

2. *Reasonable Cause to Believe Unfair Labor Practices Existed.* Aside from the equitable prerequisites, § 10(j) also requires that an unfair labor practice complaint has been issued before relief is authorized. The Teamsters argue vigorously that the underlying unfair labor practice charges are based on "novel" and somewhat dubious legal theories and that therefore the extraordinary relief inherent in a § 10(j) injunction is improper. It is indeed apparent that the General Counsel is advancing somewhat novel theories in the unfair labor practice complaints, and we must therefore decide whether it is proper for the District Court to grant a § 10(j) injunction when the unfair labor practices are

premised on legal principles that are, to a degree, untested.[11]

Arguing that "the matter of proper § 10(j) standards appears to be an open question in this Circuit," the Union urges that we take "an active judicial role in scrutinizing for the justification for the remedy and caution against deference to the decision to petition for relief." (Res. Brief p. 42). In essence, the Teamsters would require the District Court to analyze the strengths and subtleties of the opposing legal arguments and if it is decided that the unfair labor practice theory will not prevail, to deny the injunction.

■ ■ We reject the Teamsters' argument that we must withhold deference to the petition. As a threshold matter, it is axiomatic that the Board should be accorded the opportunity to pass initially on questions involving the construction of the N.L.R.A. Where the legal questions resolve around the substantive validity of unfair labor practice theories, it is particularly important that the courts make every effort to have the Board pass on the legal merits first. In a § 10(j) case, where the General Counsel's legal theories are substantial, even if "untested" or "novel," the most appropriate disposition is to do what the District Court did here—decide whether the injunction was necessary to preserve the Board's jurisdiction, whether it was equitably proper to grant relief, and then if both questions are answered in the affirmative, issue the injunction.

This "non-active" approach is followed by most, if not all of the Circuits, including the Fifth, and it was properly followed by the court below. In Retail, Wholesale & Dep't Store Union, AFL–CIO v. Rains, *supra,* this Court reviewed an order granting an injunction under § 10(*l*) in a case where the union was

11. Since we find that the Board's theories are substantial, even if somewhat novel, it is unnecessary for us to decide the propriety of § 10(j) relief in situations where the Board's theories are directly counter to prevailing law. *Cf.* McLeod v. Business Machine & Office Appliance Mechanics Conference Bd., 2 Cir. 1962, 300 F.2d 237.

arguing that an injunction was improper because the legal theories upon which the unfair labor practices were based were erroneous. The Court framed the issue as "whether this Court can and should reverse the order appealed from on the ground that there is *no basis in law* or in fact for the findings of the district court on which he based his order." *Id.* 266 F.2d at 506 (emphasis added). Speaking in terms of whether "the district judge abused his discretion in granting a temporary injunction to preserve the status quo" the Court refused to investigate the legal merits of the General Counsel's arguments and affirmed the temporary injunction.[12]

In other Circuits the decisions are even more compelling. In Kennedy v. Los Angeles Typographical Union No. 174, 9 Cir. 1969, 418 F.2d 6, the Ninth Circuit set aside a District Court order denying an injunction because the unfair labor practice was based on "unresolved" propositions of law. Remanding the case to the District Court, the Court of Appeals remarked:

"In our view the District Court was in error in deciding that the unsettled state of the law was by itself sufficient to support a finding that there was not reasonable cause for the Director to believe that an unfair labor practice had occurred.

"As this court said in San Francisco-Oakland Newspaper Guild v. Kennedy, 412 F.2d 541 (9th Cir. 1969), a preliminary injunction under § 10(*l*) should be granted 'if the court finds

that the factual allegations and the propositions of law underlying the regional director's petition are not insubstantial and frivolous so that he has reasonable cause for believing the Act has been violated, and if the court finds that injunctive relief is appropriate." *See also* Schauffler v. Local 1291, Int'l Longshoremen's Ass'n, 292 F.2d 182, 187 (3d Cir. 1961). The fact that there are no prior decisions closely tailored to the facts of this case may make the Regional Director's legal propositions novel but it does not automatically render them frivolous or insubstantial. It can hardly be said that the legal theories advanced in *cases of first impression are* necessarily without merit or frivolous. Although it may be that the union will ultimately prevail on the merits, it seems clear from the briefs that the Director's legal propositions are sufficiently sound to meet the 'reasonable cause' requirement of § 10(*l*)."

*Id.* 418 F.2d at 8. *See also,* Hoffman v. Cement Masons Union Local 357, 9 Cir. 1972, 468 F.2d 1187, 1193 (§ 10(*l*) injunction proper if legal propositions asserted by the Board are not "insubstantial and frivolous"); Kennedy v. International Brotherhood of Teamsters Local 542, 9 Cir. 1971, 443 F.2d 627 ("not for the District Court at this stage, to resolve . . . the legal issues involved"); San Francisco-Oakland Newspaper Guild v. Kennedy, 9 Cir. 1969, 412 F.2d 544 (not insubstantial and frivolous).

---

12. The Court went to great lengths to show deference to both the Regional Director's decision to petition and the District Court's discretion to grant:

"While, as we have above said, the general considerations controlling the determination here are generally those governing the issuance of interlocutory injunctions, there are the added factors here going a long way to support the action on the balancing of conveniences alone: (1) that the Board, a government agency, having at least theoretically no ax to grind and no interest to serve, has deemed the evidence sufficient to support a complaint before it;

and (2) that it is in accordance with common sense and reason to conclude, as the chancellor did on the balancing of conveniences, that picketing of this kind, if continued long enough and with enough vigor and the proceedings before the Board do not move on apace, would induce the concerted action of employees, an action which, no matter how much it is disclaimed on briefs, it must be conceded the picketing union desired and would have directly invited if it had not been prohibited by law from doing so."
266 F.2d at 506.

In Schauffler v. Local 1291, 3 Cir. 1961, 292 F.2d 182, relied upon by the court below in this case, the Third Circuit affirmed a § 10(*l*) injunction. There the District Court rejected the union's argument, similar to the one raised here by the Teamsters, that there could be no "reasonable cause" because the union's rights had already been resolved in arbitration and "it cannot be found to have engaged in unfair labor practices merely because it demanded rights guaranteed it under a collective bargaining agreement." *Id.* 292 F.2d at 186. The Court of Appeals rejected the union's invitation to decide the merits of the legal propositions and stated:

"It is apparent that many questions of fact and of law would have had to have been resolved by the court below before it could have determined the precise effect of the PMTA–ILA contract and the June 21, 1960 grievance proceeding on the present controversy. At least some of these questions must be recognized to be other than frivolous in nature. If, in a Section 10(*l*) proceeding, a district court or a court of appeals undertook to finally adjudicate such questions it would not be acting consistently with the congressional policy underlying Section 10(*l*). That Section's usefulness as a tool with which the status quo may be preserved pending final adjudication would be diminished insofar as the Board would be required to finally litigate questions of substance at a preliminary stage. Moreover, the court would not have the benefit of the Board's opinion on questions of fact and novel questions of labor law when making its decision. Thus, the court would, to some extent, usurp the Board's function as the primary fact finder in cases arising under the Act and its function as primary interpreter of the statutory scheme. We are of the opinion, therefore, that the issue of the effect of the contract as interpreted by the grievance committee was properly left to the Board by the court below and that the existence of this issue cannot be held by this court to render the district court's finding of reasonable cause clearly erroneous. See Retail, Wholesale & Dept. Store Union v. Rains, 5 Cir., 1959, 266 F.2d 503; Douds v. International Longshoremen's Ass'n, 2 Cir., 1957, 242 F.2d 808, 810–811; Douds v. Milk Drivers & Dairy Employees Union, 2 Cir., 1957, 248 F.2d 534."

*Id.* 292 F.2d at 188. *See also* Samoff v. Building & Construction Trades Council, 3 Cir. 1973, 475 F.2d 203 (injunction proper if legal issues are substantial and not frivolous, even if District Court considers them erroneous).

This approach was followed by the Eighth Circuit in Local Joint Board, Hotel & Rest. Employees and Bartenders International Union v. Sperry, 8 Cir. 1963, 323 F.2d 75, a case affirming a § 10(*l*) injunction. The Court of Appeals rejected the union's argument that the General Counsel's legal theory was conclusively unsound and stated:

"Like the trial court, we emphasize that we herein express no view as to the merits of the unfair labor charge pending before the Board or the merits of a pending action by the Union to enforce its alleged contractual rights. What we have heretofore said with respect to the issue of statutory interpretation is only for the purpose of illustrating that substantial questions of statutory determination are presented and does not express any view as to what the final interpretation of the statute should be. As above stated, our holding here is limited to our determination that a reasonable cause exists for the trial court's action in granting the temporary injunction."

*Id.* 323 F.2d at 79.

The only two Court of Appeals' cases cited by the Teamsters, both from the Second Circuit, do not compel or convince us to follow a contrary path. McLeod v. General Electric, 2 Cir. 1966, 366 F.2d 847, did indeed say that the District Court should stay its hand in

cases where novel legal questions are presented to the Board. That opinion, however, was heavily colored by the additional finding that:

"We are not convinced that the facts in the present case reveal those special circumstances which must be present before a court will intervene and issue an injunction prior to the Board's hearing and decision. The Board has not demonstrated that an injunction is necessary to preserve the status quo or to prevent any irreparable harm. . . ."

*Id.* 366 F.2d at 850. The Court's reasoning was that it would be improper to give a temporary injunction where the unfair labor practices were questionable under circumstances where the injunction was not necessary to preserve the issues for the Board. Certainly, that was not the case below.

In McLeod v. Business Machine & Office Appliance Mechanics Conference Board, 2 Cir. 1962, 300 F.2d 237, the Second Circuit did reverse the granting of broad § 10(*l*) relief where the District Court's order enjoined all distribution of handbills. That case can be distinguished on the ground that the Second Circuit explicitly found that the General Counsel's theories were erroneous.[13] Although we must concede that the theories in this case are somewhat novel, there are no cases squarely supporting or squarely prohibiting these charges, and for that reason we are unwilling to make a determination of the merits, particularly in light of our finding that the General Counsel's theories are, in fact, substantial and not frivolous. *See* Section IV, *infra*.

In any event, the Second Circuit's most recent pronouncement in this area, McLeod v. National Maritime Union, 2

Cir. 1972, 457 F.2d 1127, supports the granting of the injunction in this case. There, the District Court had denied a § 10(*l*) injunction on the ground that no unfair labor practices had been committed. The Second Circuit reversed, finding that since there was a "reasonable possibility that the unfair labor practice charges would be sustained by the Board," the injunction should have issued, particularly, the Court noted, since the court's decision "is only a preliminary decision and the final decision will be made by the N.L.R.B. and the courts to whom the decision may be appealed."

▮ In sum, when faced with a § 10(j) petition, the District Court should not engage in a dispositive analysis of the legal issues involved in the underlying unfair labor practice proceedings and should examine them only as far as necessary to determine whether the theories are insubstantial or frivolous. Where the circumstances make equitable relief proper, as here, and the legal theories are novel and contested, as they are here, the temporary injunction should be granted so long as the legal theories are not insubstantial or frivolous. Thus, the legal questions are preserved for the forum that Congress has designated as best qualified to pass upon these matters.[14]

B. *Standards for Appellate Review of a § 10(j) Injunction*

▮ The parties have joined issue over the appropriate standard by which this Court should review the order entered below. Although many of the cases speak solely in terms of "clearly erroneous," *e. g.*, Madden v. International Org. of Masters, Mates and Pilots, *supra;* American Federation of Radio & Television Artists v. Getreu, 6 Cir. 1958,

13. There was a strong dissent by Judge Moore in that case, arguing that the majority was ignoring the appropriately lenient "reasonable cause" standards.

14. *See also* Sachs v. Local Union No. 48, 4 Cir. 1972, 454 F.2d 879; Solien v. Miscellaneous Drivers & Helpers Union,

Local 610, 8 Cir. 1971, 440 F.2d 124; N.L.R.B. v. Acker Industries, 10 Cir. 1972, 460 F.2d 649; Terminal Freight Cooperative Ass'n v. N.L.R.B., 3 Cir. 1971, 447 F.2d 1099. *See generally,* Note, 45 Tex.L.Rev. 358 (1966); Note, 42 Wash.L.Rev. 1107 (1967).

258 F.2d 698, 699; Local No. 83 v. Jenkins, 9 Cir. 1962, 308 F.2d 516, 517, or "abuse of discretion," *e. g.*, Retail, Wholesale & Dep't Store Union, AFL–CIO v. Rains, *supra,* we believe the appropriate standard, at least where relief is granted,[15] is similar to that employed in all other cases where we review equitable interlocutory relief. The factual findings of the District Court, *i. e.*, what happened and what will happen, are reviewable under the "clearly erroneous" standard as are all factual questions. The need for equitable relief is left to the discretion of the District Court in the first instance and is only reviewable to the extent that such discretion has been abused. The lower court's legal conclusions—here, whether the Board's legal theories are substantial and not frivolous,—are subject to the same standard of review as any legal conclusion of the District Court: was it correct? *See* McLeod v. Local 282, 2 Cir. 1965, 345 F.2d 1420. Reviewing the "correctness" of the District Court's decision in this instance, however, is not the same as testing the correctness of the General Counsel's legal theories. The District Court's "legal" conclusions were that the § 8(b)(3) theories were "substantial," not that they will or should ultimately prevail on the merits. Our "legal" review is limited solely to whether the General Counsel's theories were substantial and not whether they were correct.

We have heretofore determined that the District Court did not abuse its discretion in granting equitable relief. There is little, if any, meaningful factual dispute and it is clear that the relevant factual findings are not "clearly erroneous." That leaves only the District Court's legal conclusions for us to review. The issue, simply stated, is whether in applying the deferential § 10(j) standards, the District Court erred in finding that the unfair labor practice charges were "substantial" and therefore whether the Regional Director had "reasonable cause to believe" unfair labor practices were being committed.

## IV. SUBSTANTIALITY OF THE UNFAIR LABOR PRACTICE CHARGES

In the underlying unfair labor practice proceeding, the Teamsters were charged with violations of § 8(b)(1)(A) and § 8(b)(3) of the Act.[16] The District Court found reasonable cause existed to believe § 8(b)(3) was being violated and refused to pass on whether a substantial § 8(b)(1)(A) theory was presented. The Teamsters have argued in their reply brief that the § 8(b)(1)(A) charge is not before this Court. Inasmuch as an injunction would have been proper if either charge is "substantial" and since the facts involving both charges were fully presented to the court below, there is no reason why the § 8(b)(1)(A) issue is not before us. The refusal of the District Court to pass on the matter does not preclude an appellate determination where there is no disputed factual questions. Indeed, a good argument can be made that the two charged violations are mutually exclusive—if one is found, the other cannot be found—and thus it is appropriate to review the substantiality of both charges.

---

15. Because of the congressional policy favoring § 10(j) and § 10(*l*) relief, several courts have applied more stringent review in cases where injunctive relief has been *denied* by the District Court. *E. g.*, McLeod v. National Maritime Union, *supra;* Local No. 83, Construction, Bldg., Materials & Misc. Drivers Union v. Jenkins, 9 Cir. 1962, 308 F.2d 516, 517 n. 1.

16. The two sections read as follows:
"8(b) It shall be an unfair labor practice for a labor organization or its agents—
 \* \* \* \* \*
"(1) to restrain or coerce (A) employees in the exercise of the rights guaranteed under section 7 . . . .
 \* \* \* \* \*
"(3) to refuse to bargain collectively with an employer, provided it is the representative of his employees subject to the provisions of section 9(a)."

In their argument that there was no "reasonable cause to believe" unfair labor practices were occurring, the Teamsters make essentially three contentions: (A) the Board will defer to the arbitration award; (B) the accretion was proper under Board standards; and (C) the pursual of contractual grievance procedures when no contrary Board ruling exists cannot, in itself, be considered an unfair labor practice. If the Teamsters are clearly correct on any of these three contentions, it would be difficult to sustain unfair labor practice charges based on the underlying facts. If, on the other hand, none of the contentions is so clearly meritorious as to render the General Counsel's theories "insubstantial," we must affirm the injunction even if we believe the Teamsters might well prevail on the merits, a determination we need not make here.

## A. Board Deference to the Arbitrator's Determination

The National Grievance Committee held that under the contract the Florida operation was an accretion to the Pilot system and that therefore the Teamsters were entitled to represent the Pilot employees in Florida. At this point we do not dispute the contention that the award represents the final authoritative construction of the contract, and we approach this problem assuming that the contract authorizes an accretion.

Relying on this definitive contractual award, the Teamsters argue that because accretion has been held to be a proper subject for arbitration, e. g., International Union of Operating Engineers, Local 279 v. Sid Richardson Carbon Co., 5 Cir. 1973, 471 F.2d 1175, 1177; Carey v. Westinghouse Elec. Corp., 1964, 375 U.S. 261, 84 S.Ct. 401, 11 L.Ed.2d 320 and because the Board defers to arbitral determinations in representation matters, including accretions, e. g., Raley's Inc., 143 NLRB 256 (1963), no unfair labor practice could be found because the arbitrator's accretion decision should be given controlling weight by the Board. We disagree.

The Union is correct in stating that accretion questions can be arbitrated, and we have in fact compelled and enforced arbitration in cases where representation matters were in issue. E. g., Teamsters Local Union 745 v. Braswell Motor Freight Lines, Inc., 5 Cir. 1968, 392 F.2d 1, on rehearing, 395 F.2d 655; International Brotherhood of Firemen & Oilers v. International Ass'n of Machinists, 5 Cir. 1964, 338 F.2d 176. See also Carey v. Westinghouse Elec. Corp., supra. At the same time, however, we have never waivered from the proposition that representation and unit determination questions are always subject to the superior jurisdiction of the N.L.R.B. So while accretion questions are arbitrable, the Board, in its exercise of superior jurisdiction, will only defer to the arbitrator's determination of the scope of the unit if such determination is consistent with the Board's own standards. In this case it is not the Regional Director's position that the award was nonarbitrable. He argues only that this arbitration award is not consistent with Board accretion standards and that therefore the Board would not defer to it.

Raley's, Inc., supra, is the landmark authority for the proposition that deference be paid by the Board to an arbitration award in representational matters. But in that decision the Board quite clearly states that it can pay deference "in a proper case," not that it must in all cases. The arbitrator's award in Raley's was deferred to only because the Board found "nothing in the arbitrator's decision relating to the contract coverage . . . that is repugnant to the purposes and policies of the Act." Id. at 259. See also Champlain Petroleum Co., 201 NLRB No. 9 (1973); Goodyear Tire & Rubber Co., 147 NLRB 1233 (1964); Insulation & Specialities, Inc., 144 NLRB 1540.

Although Raley's has never been repudiated by the Board, its application has been severely limited. In the past eight years, the Board has narrowed considerably the universe of arbitration awards

that will be deferred to when unit determinations are at issue. *See* Hotel Employer's Assoc. of San Francisco, 159 NLRB 143 (1966). In Westinghouse Elec. Corp., 162 NLRB 768 (1967), the Board was faced with a representational dispute that had previously been the subject of the arbitration proceedings held pursuant to the Supreme Court's order in *Carey*. In deciding the representational questions the Board refused to defer to the arbitrator's resolution, stating "the arbitrator's award must clearly reflect the use of and be consistent with Board standards." *Id.* at 771.

In 1972, in Combustion Engineering, Inc., 195 NLRB No. 161, the Board was confronted with a representational dispute in which an arbitration award had already been rendered determining that a new unit, eight miles from the original plant, was, under the contract, an accretion. The Board, despite recognizing that the arbitrator "took into consideration standards laid down by the Board in the matter of determining appropriate units," refused to defer to the arbitrator's accretion award. In issuing its cease and desist order, the Board explicitly refused to be bound, in any way, by the arbitrator's decision and stated "it is nevertheless the obligation of the Board to consider whether the employees at . . . [the new unit] constituted an accretion to the unit." *See also* Horn & Hardart Co., 173 NLRB 1077 (1968), enforced, 2 Cir. 1971, 439 F.2d 674, 678–81; Woolwich, Inc., 185 NLRB No. 127 (1970); Kennedy, Labor Board Deferral to Arbitration of Contract Disputes, in Labor Law Developments 145 (Southwestern Legal Found. 1972). *See generally* Hutchings v. United States Industries, 5 Cir. 1970, 428 F.2d 303, 314; Note, The N.L.R.B. and Deference to Arbitration, 77 Yale L.J. 1191 (1968); Note, 18 Wayne L.R. 1191 (1972).

In light of the long line of Board cases indicating that arbitration awards in representational matters will be deferred to only if consistent with Board policy, we are unconvinced that this was clearly a case for deference. Particularly here, where (1) the arbitration award was extremely cryptic, giving no evidence that Board standards were in any way considered, and (2) the award effected the free choice of some 140 employees who played no part in either the contract bargaining or the arbitration pursuant to it, we refuse to say the Regional Director is being frivolous when he assumes the Board will not defer to the arbitration award.

B. *Accretion of the Florida Operation Under Board Standards*

Even assuming that the Board might not defer to the award, if it is clear that the accretion is proper under the N.L.R.A., any possibility of an unfair labor practice would be precluded and the injunction would have been improper. Of course, under § 10(j) it is not necessary for us to determine definitely whether the Board, or for that matter, this Court, would find an accretion under these circumstances. Rather, we only need find that the Regional Director's theory of nonaccretion is "substantial" and not frivolous. Clearly, it meets this standard.

It is true that system-wide units in the trucking industry have been found appropriate. *E. g.*, Teamsters Local Union 745 v. Braswell Motor Freight Lines, Inc., *supra*. It is also true that less than system-wide units have been held appropriate despite contentions by either the company or union that this was wrong. *E. g.*, Groendyke Transport, Inc. v. N. L. R. B., 5 Cir. 1971, 438 F.2d 981; Alterman Transport Lines, 178 NLRB 122 (1969), 183 NLRB No. 2 (1970), enforced, 5 Cir. 1972, 465 F.2d 950.

▉ In any event, the Board has traditionally been reluctant to find an accretion, even where the resulting unit would be appropriate, in those cases where a smaller unit, consisting solely of the accreted unit, would also be appropriate and the § 7 rights of the accreted employees would be better preserved by denying the accretion. In Melbet Jewelry Co., 180 NLRB 107 (1969), the Board

was confronted with a claim that under the relevant contract a new store had accreted to a chain-wide unit and that therefore the union should be accorded representative status. Defending § 8(b)(1)(A) charges before the Board, the Union argued that the contract provided for such accretion and that it could not therefore be committing an unfair labor practice by its demands. There the Company had not contested the accretion so there was no arbitration award. In finding a § 8(b)(1)(A) violation and rejecting the accretion (despite the contractual agreement of the parties), the Board stated:

"Assuming that both units may be appropriate . . . it does not follow that the Board should permit the employees [of the new store] in the circumstances of this case, to be subject to a contract between the employer and a union without their having had the opportunity to determine for themselves whether or not they wish to be represented by the contractual bargaining representative.

"We will not, however, under the guise of accretion, compel a group of employees, who may constitute a separate appropriate unit, to be included in an overall unit without allowing the employees the opportunity of expressing their preference in a secret election or by some other evidence that they wish to authorize the Union to represent them."

*Id.* 180 NLRB at 109. *See also,* Sheraton-Kauai Corp. v. N. L. R. B., 9 Cir. 1970, 429 F.2d 1352.

In the instant case it is possible that the broader integrated unit sought by the Teamsters might be found appropriate. It is also quite possible that the unit found appropriate might exclude the Florida operation. There are many reasons militating against the accretion including, *inter alia,* the totally different employer-worker relationship practiced by Pilot in Florida, the inability of the Teamsters to organize the Pilot workers in Florida, the lack of significant interchange of personnel between Florida and the rest of the system, and the lack of geographical proximity with the rest of the Pilot system. It is certainly not frivolous for the General Counsel to believe an accretion might not be found by the Board.

The Board has taken an extremely narrow view of permissible contractual accretions. In Pix Manufacturing Co., 181 NLRB 88 (1970), the Teamsters were defending unfair labor practice charges for pursuing an arbitration award granting a contractual accretion of a new unit. The Board rejected the Teamsters' arguments and made the following statements which are indicative of the Board's attitude towards arbitral awards finding accretion:

"Even assuming that the arbitration proceeding herein was fair and regular and all parties agreed to be bound, I conclude there is no merit in Teamsters position that the Board must honor the award without considering whether it clearly reflected the use of and was consonant with Board standards in determining whether Pix's production and maintenance employees accreted to the unit described in E.I.'s contract with Teamsters. Thus, the resolution of this question could determine whether or not Respondent unlawfully recognized and bargained with Teamsters as the exclusive bargaining representative of its production and maintenance employees.

"Although the criteria used in resolving unit and accretion issues are quite similar, the Board has been more restrictive in their application to accretions. This is so because the resolution of competing claims for a single unit or a multiplant unit merely determines in which unit the employees will be permitted to vote to insure them the fullest freedom in exercising the rights guaranteed by Section 9(b) of the Act. Whereas, when a claim of accretion is made to an existing unit, a favorable determination forecloses a vote and restricts the employees in the exercise of their basic

right to select their bargaining representative. That right is the predominant consideration under Section 7 of the Act and is to be restricted only under 'compelling conditions.' See Sunset House, 167 NLRB No. 132; Kinney National Maintenance Services, 177 NLRB No. 53.

"In determining whether a particular operation constitutes an accretion or a separate unit, the Board gives weight to a variety of factors, such as integration of operations, centralization of managerial and administrative control, geographic proximity, similarity of working conditions, skills, and functions, control over labor relations, collective-bargaining history, and interchangeability of employees. A variety of factors, some militating toward and some against accretion, are usually present so that a balancing of factors is necessary."

*Id.* 181 NLRB at 90.

■ Ultimately, the Board has very broad discretion in resolving these unit questions, *see* N. L. R. B. v. Alterman Transport Lines, 5 Cir. 1972, 465 F.2d 950, and it is not our role to render a definitive resolution in this proceeding. In order to affirm a finding of "reasonable cause" it is sufficient that the General Counsel's reasons for rejecting the accretion be "substantial." We need not and should not decide if they are "correct." Applying such standards, we find that there was reasonable cause to believe that the N.L.R.B. would have rejected the Teamsters' contention that an accretion was appropriate.

C. *The Unfair Labor Practice Charges*

Having decided that the District Court could properly find that the Regional Director had reason to believe the Board would not defer to the arbitration award and find an accretion, we must now confront the Union's primary contention—that regardless of the appropri-ateness of the unit it is seeking, it cannot be an unfair labor practice for it to obtain and enforce an arbitration award where there is no existing Board ruling contrary to the unit resolution found by the arbitrator. Again, under § 10(j) it is not our function to decide the ultimate merits of the unfair labor practice theories expounded in the complaints. We first examine the two charges found in the complaint to see if they state substantial claims and we then discuss the Teamsters' contention that the arbitration award provides legal insulation for their activities.

Although the District Court found reasonable cause only as to the § 8(b)(3) charge, we find both charges to be "substantial."

■ 1. *§ 8(b)(1)(A).* Section 8 (b)(1)(A) makes it an unfair labor practice for a union "to restrain or coerce employees in the exercise of the rights guaranteed in section 7." The theory behind the 8(b)(1)(A) charge in this case is that by seeking recognition of the Florida operation, the Teamsters were infringing on the rights of the workers in Florida to choose or reject collective representation freely. If the arbitrator's award is complied with, the conclusion seems inescapable that the free choice of these employees will have been sacrificed. It is true that in some circumstances the Board permits an accretion where majority status is not demonstrated at the new unit; however, this is the exception rather than the rule, and in recent years the Board has been extremely protective of the employees' free choice in those situations where the accreted unit could stand on its own. The Board has not hesitated to find § 8(b)(1)(A) violations in circumstances where the Union was attempting to implement an accretion of a new unit when such accretion did not meet Board standards.[17]

17. In Retail Clerk's Union, Local 870, 192 NLRB No. 33, the Board upheld an accretion where there was an accretion pro-vision in the relevant contract *and also a showing of majority status in the unit that was accreted.* In giving considera-

In Shop-Rite, 170 NLRB 446 (1968), the Board found that the Union violated § 8(b)(1)(A) by seeking enforcement of a contractual accretion. The Board concluded:

"We find, therefore, that the Respondent Company and the Respondent Union, by enforcing their agreement with regard to [the new store in the unit] at a time when the Respondent Union was not the freely selected majority representative of those employees unlawfully infringed upon the statutory right of such employees to express a free choice as to their bargaining representative and accordingly . . . the Union violated § 8(b)(1)(A) . . ."

Similarly, in Sunset House, 167 NLRB 870, 875, enforced, 9 Cir. 1969, 415 F.2d 545, the Board rejected the Union's accretion theory and stated that "by obtaining recognition and by executing and maintaining a contract containing union security provisions . . . the Union has engaged in unfair labor practices within § 8(b)(1)(A)." *See also Pix Manufacturing Co., supra; Melbet Jewelry Co., supra.*

In a recent case with a remarkably similar procedural posture regarding the unfair labor practices,[18] the Ninth Circuit enforced a Board order finding § 8(b)(1)(A) violations against a union that was seeking a contractual accretion of a new unit where there was no contrary Board ruling at the time the accretion was effected. Sheraton-Kauai Corp. v. N. L. R. B., *supra.* In that case the Board was petitioning the Court for enforcement of its order, so the Court not only had to decide that the Board

theory was substantial, it also had to find that it was correct. The Court enforced the Board's order, rejected the accretion, and found the Union's efforts to represent the accreted employees at the new unit violated § 8(b)(1)(A). The Court held, in pertinent part:

"These rulings directly concerned unit determinations in connection with initial representation petitions. As the Board has noted, however, essentially the same factors are involved in determining whether employees at a subsequently established single location should be absorbed into an existing multiple-location unit without their consent. In the latter situation, section 7 rights are even more clearly at stake. If the Board, in making its initial representation determination, decides that a multiple-location unit is appropriate, employees at each-included single location have an opportunity to participate in the resolution of the representation issue. But if employees at a new single location are simply absorbed into the multiple-location unit by accretion, they are denied that opportunity. Nor does the procedure for decertification under section 9 of the Act provide an adequate remedy for these employees. Hence, the Board has held that even though it might have found an overall unit appropriate on a representation petition, and thus have given all employees at all locations an equal voice in the initial representation decision, it would not 'under the guise of accretion, compel a group of employees, who may constitute a separate appropriate unit, to be included in an overall unit with-

---

tion to the accretion clause, the Board noted:

"Although we have in past cases refused to give controlling weight to such a clause, our only reason for not giving controlling effect to the contractual commitment of the parties has been our concern over protecting the rights of future employees to have a say in the selection of their bargaining representative."

77 LRRM at 1710.

18. The company did not dispute the accretion in *Sheraton-Kauai* and an arbitration award was not therefore necessary to achieve a final interpretation of the contract. If anything, the total lack of compliance by Pilot in the instant case makes the Union's transgressions more substantial.

out allowing those employees the opportunity of expressing their preference in a secret election or by some other evidence that they wish to authorize the Union to represent them.' Melbet Jewelry Co., 180 N.L.R.B. No. 24 (1969). *See also* Super Valu Stores, Inc., 177 N.L.R.B. No. 63 (1969); Warehouse Markets, Inc., 174 N.L.R.B. No. 70 (1969). . . . .

". . . The *Appleton* opinion suggests that the issue is controlled by the existence of an accretion clause in a lawful collective bargaining contract. But neither the Board's discretion under section 9(b), nor the employees' right of self-determination under section 7, can be limited by contract between a union and employer. NLRB v. Sunset House, *supra*, 415 F. 2d at 547, 548; Welch Scientific Co. v. NLRB, 340 F.2d 199, 202–203 (2d Cir. 1965). *Cf.* Local 919, Retail Clerks International Association, *supra*, 416 F.2d at 1118. And the fact that section 7 guarantees employees the right to reject union representation entirely precludes the Board from giving controlling weight to the *Appleton* court's concern that nonenforcement of an accretion clause would deprive employees at the new location of union representation during the period of time required to prepare for and hold a representation election."

*Id.*, 429 F.2d at 1355–1357 (footnote omitted). *See also* International Ladies Garment Worker's Union v. N. L. R. B., 1961, 366 U.S. 731, 81 S.Ct. 1603, 6 L. Ed.2d 762 (Bernhard Altman); Southern Conference of Teamsters v. Red Ball Motor Freight, Inc., 5 Cir. 1967, 374 F. 2d 932.

In N. L. R. B. v. Driver's Local Union No. 639, 1960, 362 U.S. 274, 80 S.Ct. 706, 4 L.Ed.2d 710 (Curtis Brothers), the Supreme Court rejected a § 8(b)(1)(A) charge where the union was engaged in peaceful picketing aimed at recognition. Here, where the Union's activities went beyond picketing and involved the implementation of a contractual accretion, it is clear that the § 7 rights, protected by § 8(b)(1)(A), are more readily threatened. We are sensitive to the District Court's fears that *Curtis Brothers* might preclude the § 8(b)(1)(A) charge, but these fears could not have been sufficient to render the General Counsel's complaint insubstantial. Without deciding the ultimate merits, it is clear that in recent years the Board has been applying *Curtis Brothers* more narrowly and *Bernhard Altman* more broadly, and in view of the deferential § 10(j) standards, we find that the Board's § 8(b)(1)(A) charge was not so counter to prevailing law that it could have been deemed insubstantial.

2. *§ 8(b)(3)*. Section 8(b)(3) makes it an unfair labor practice for a union to "refuse to bargain collectively with an employer." The basis of the instant § 8(b)(3) charge is that it is an unfair labor practice for the Union to exert economic pressure for the purpose of illegally expanding the contractual bargaining unit. The novelty of this § 8(b)(3) theory is that it condemns the Union for seeking to expand the "historical bargaining unit" even though the arbitrator has previously determined that the contractual bargaining unit includes the Florida operation and no contrary Board determination has ever been made. Another potential difficulty is the possibly inconsistent position of the § 8(b)(3) charge *vis-a-vis* the § 8(b)(1)(A) charge in that the latter charge is premised largely on the notion that the contract does cover the Florida workers whereas the § 8(b)(3) charge seems to charge the Union with expanding the contractual unit. We are not unaware of these difficulties or inconsistencies, but at the same time we do not consider them fatal to the Regional Director's petition. If anything, they underscore the complexities of the legal issues that the Board must resolve and are illustrative of why it is important to preserve these difficult but substantial questions for initial Board determination.

Attacking the substantiality of the § 8(b)(3) charge, the Teamsters primarily argue that those cases which have found § 8(b)(3) violations in similar circumstances, such as Smith Steel Workers Union v. A. O. Smith Corp., 7 Cir. 1969, 420 F.2d 1, were based on the notion that it is illegal to seek expansion of the unit through contractual means *when there is an existing contrary Board determination that a different unit is appropriate*. Here, although the Board processes have been triggered, the Board has yet to decide the appropriateness of the system-wide Pilot unit. *See also* Douds v. International Longshoremen's Ass'n, S.D.N.Y.1956, 147 F.Supp. 103, aff'd, 2 Cir. 1957, 241 F.2d 278; Hess Oil & Chemical Corp. v. N. L. R. B., 5 Cir. 1969, 415 F.2d 440.

Without engaging in unnecessary analysis, we realize that the § 8(b)(3) application sought in this case is somewhat novel. But as we have found earlier in the opinion, a charged violation is not rendered insubstantial merely because it is novel. While the Teamsters have quite skillfully pointed out the novelty of the § 8(b)(3) theory, we are not convinced that the General Counsel's theories are not substantial.

While the presence of a contrary Board ruling can be used to distinguish cases such as *Smith Steel Workers,* we are unconvinced that the reasoning of such cases could not be applied here. A recent Board opinion relied upon by the Union only serves to highlight the uncertainty of the ultimate merits here. In Sperry Systems Management, Sperry Rand Corp., 202 NLRB No. 18 (March 8, 1973), three Board members found that a union had not violated § 8(b)(3) by attempting to secure compliance with an arbitration award involving contract coverage of non-union employees because the Board had not yet acted on the disputed unit determination. *Sperry* is admittedly strong authority for the Union, but it nevertheless leaves grave doubts as to how the Board would decide the issues in the instant case. In *Sperry*, the Board explicitly narrowed its holding to

cases, such as the one then before it, where actual representational rights were not being sought. In that case the Union was seeking only to save certain wage and benefit standards applied to allegedly accreted employees for purposes of work preservation and *was not seeking representation of these people*. The Board, in limiting its holding, stated:

"Certain of the Union's actions, including particularly its demands with respect to the layoff of three employees at the Vallejo facility, may well appear at first glance at least to have representational overtones.[2] We

"2. We do not deem it necessary to reach the question of whether or not the Administrative Law Judge was correct in discounting the arguably representational nature of this demand as being merely an attempt to win employee support in the Vallejo election.

are unwilling to say that the Union's attempt to discuss, or to have arbitrated, the issue of whether its objections to the layoff relate to economic benefits or are representational, and thus precluded from coverage by the award, rises to the level of a violation of Section 8(b)(3). Here again we note that there is no evidence that the Union's attempt to resolve the application of the award to Respondent's claims as to the layoff through peaceful and orderly means would have disrupted the ongoing bargaining relationship in the New York unit. Nor was any economic action taken or threatened in support of this union demand which might have had an adverse effect upon the New York bargaining relationship. In fact, it would seem that any contrary ruling by this Board would improperly interfere with Respondent's right to seek an orderly and peaceful determination on its contractual rights.

The fact that the Board in *Sperry* deemed it necessary to find that representational questions were not resolved by the arbitration award certainly leaves the fate of this case, where the representational rights of some 140 workers

are directly at issue, in limbo. The ambiguity is further amplified by the fact that Board members Kennedy and Penello dissented in *Sperry* on the grounds that *Bernhard-Altman* rendered the unit inappropriate and that *Smith Steel Workers* rendered the Union's attempt to secure compliance with the arbitration award violative of § 8(b)(3). What is ultimately derived from *Sperry* is that a minimum of two Board members, and quite possibly more, would sustain § 8(b)(3) charges in the instant case. With such clear uncertainty emanating from the Board, it would be most improper for the District Court here to dismiss the § 8(b)(3) charges as being insubstantial.

Although the Board had not yet acted when the arbitration award was issued and compliance was sought, it is clear that the Union persisted in its contractual grievance well after the time the Board's jurisdiction on the same issue had been invoked. There can be no question that the Board would eventually exercise its superior jurisdiction and that its decision would quite obviously resolve the exact question passed on by the Grievance Committee. Even considering the sometimes tortoise-like movement of the Board, we are not convinced that the *Smith Steel Workers* rationale would not extend to such a set of facts. Under § 8(b)(3) it can be an unfair labor practice for a union to persist in its demands for an expanded, inappropriate unit. *Cf.* International Brotherhood of Boilermakers, Iron Shipbuilders v. Combustion Engineering, D.Conn., 1971, 337 F.Supp. 1349; N. L. R. B. v. I. B. E. W., 5 Cir. 1959, 266 F.2d 349. We agree with the District Court that the Regional Director's petition, although novel, has stated a substantial § 8(b)(3) claim.

3. *Effect of the Arbitration Award.* The Teamsters' heaviest attack on the finding of "reasonable cause" is its persistent contention that regardless of the ultimate validity of the accretion, Carey v. Westinghouse, *supra*, clearly contemplates arbitration of accretion questions

and that it cannot therefore be unlawful to pursue such arbitration even where the grievance award might eventually be preempted by the Board.

We fully recognize the indispensable and central role played by arbitration in the resolution of labor disputes and we do not question that the instant dispute was arbitrable. *See* International Union of Operating Engineers, Local 279 v. Sid Richardson Carbon Co., *supra.* But this does not move us from the conclusion that where the result sought and obtained by way of arbitration would be invalid under the N.L.R.A., as might be the case here, the entire enterprise should be insulated from unfair labor practice charges. Particularly here, where the rights of some 140 workers who have in no way participated are at stake, it would be anomalous to say that the arbitration award precludes the basic safeguards of the Act and shields the Union. *Cf.* New Orleans Typographical Union, No. 17 v. N. L. R. B., 5 Cir. 1966, 368 F.2d 755.

In enforcing the award in this case, Judge Ward properly recognized that the unfair labor practice questions were in no way disposed of by the arbitration award even though it was his duty to enforce the award. Pilot Freight Carriers, Inc. v. International Brotherhood of Teamsters, *supra*, 353 F.Supp. at 872. *Carey* and its progeny in no way provide the broad insulation sought by the Teamsters; they all recognize the superior authority of the Board in representation matters, and nothing in *Carey* precludes the exercise of Board jurisdiction in unfair labor cases. As the Seventh Circuit recently noted in a case denying enforcement of an arbitration award that had granted damages for refusal to bargain with a unit that had been held inappropriate by the Board after the arbitration award was rendered:

"A complete reading of *Smith*, [*Smith Steelworkers*] and its recognition of *Carey* and related cases, makes clear to us the relevance of the supremacy

doctrine, and that once the Board has acted, either before or after the arbitrator's award, the Board's order overrides the arbitrator's decision. *Smith* further makes it clear that contractual rights cannot exist separately and apart from the union's rights to represent the unit."

Local 7–210, Oil, Chemical & Atomic Workers International Union, AFL–CIO v. Union Tank Car, 7 Cir. 1973, 475 F.2d 194, at 199 (1973).

The proposition that a union can be guilty of unfair labor practices by pursuing contractual grievance processes is hardly as novel as the Teamsters contend. The Board, in its unfair labor practice charges, essentially urges that implementation of the arbitration award would violate the N.L.R.A. The Board has often found unfair labor practices in instances where a union seeks compliance with contractual provisions or awards entered to enforce such provisions, where the result would be an illegal hot cargo violation. *E. G.*, Retail Clerks Union v. Food Employers Council, Inc., 9 Cir. 1965, 351 F.2d 525; McLeod v. A. F. T. R. A., S.D.N.Y.1964, 234 F.Supp. 832, aff'd per curiam, 2 Cir. 1965, 351 F.2d 510. The District Court's response to the *Carey* argument in McLeod v. A. F. T. R. A., a case dealing with the application of § 10(*l*) is instructive:

"The Board is specifically empowered and directed by the statute to petition the District Court for this injunctive relief. While the general rule concerning the desirability of arbitration is entitled to some weight, surely when the Board petitions to enjoin an unfair labor practice the mere fact that this unfair labor practice involves a clause subject to arbitration should not remove this case from the broader rules of law applicable to Section 10(*l*) suits and place it totally within the realm of Section 301(a) suits which govern suits by *employer* and/or *employee*. Cf., Local 174, Teamsters, Chauffeurs, Warehousemen and Helpers of America v. Lucas

Flour Co., 369 U.S. 95, 101 n. 9, 82 S. Ct. 571, 7 L.Ed.2d 593 (1962). If Paragraph 7 is within the purview of Section 8(e) and thus an unfair labor practice, then to that extent the Court under Section 10(*l*) should grant the relief requested and enjoin the implementation of that clause whether that implementation is by arbitration or otherwise."

*Id.* 234 F.Supp. at 840. Similarly, in Schauffler v. Local 1291, *supra,* the Third Circuit upheld a § 10(*l*) injunction despite the presence of an arbitration award supportive of the union and despite the union's argument "that it cannot be found to have engaged in unfair labor practices merely because it demanded rights guaranteed it under a collective bargaining agreement." 292 F.2d at 186. *See also* N. L. R. B. v. New Orleans Typographical Union No. 17, *supra;* National Maritime Union v. Commerce Tankers Corp., *supra; Pix Manuf. Co., supra; Sunset House, supra; Shop-Rite, supra; Sperry Systems, supra.*

The final, binding effect of arbitration, so essential to labor peace, is not fully applicable where the questions before the arbitrator are almost wholly representational and potentially subject to the superior authority of the Board. When the central problem is one of the unit's appropriateness, the arbitrator is powerless to give a decision that will be "final and binding" on the parties. The Board will only defer to the decision if it is consistent with Board standards. The arbitrator can give only a final interpretation of the contract, and in representation matters it is clear that the parties are not at liberty to determine the appropriate unit. Where the arbitration award that is sought and received potentially runs afoul of the Act and threatens the Board's primary authority to determine the appropriate unit, it does not provide blanket insulation from unfair labor charges, particularly where, as here, the Board's processes have already commenced.

The thrust of *Carey* is that resolution of contractual issues can often render the Board's determination unnecessary or, at least, can aid the Board in resolving representational matters where contract interpretation is at issue. *E. g., Raley's, Inc., supra.* For example, had the arbitrator decided *against* the Teamsters, further Board proceedings quite possibly would have been rendered unnecessary. In addition, in cases such as *Carey*, when the representational question is often strongly tied into contract interpretation rather than a pure unit determination, the need for receiving a final construction of the contract is readily apparent. Here, however, where the award sought was almost purely a unit determination involving the § 7 rights of 140 employees, we fail to see how the parties could have expected the award to be "final" when every case since *Carey* explicitly states that the Board's authority is superior.

 The arbitrator has no obligation whatsoever to abide by the N.L.R.A.[19] and when, as here, the unit determination that will ultimately set the rights of the parties only marginally concerns the construction of the contract, we refuse to find that the Union is protected from unfair labor practices simply because it is "seeking enforcement of its contract." In short, the parties are free to arbitrate representation matters, but when the arbitration is part of a larger enterprise that has as its alleged objective either the infringement of § 7 rights of numerous non-represented employees or the frustration of an ongoing bargaining relationship, there can be no assurance that the use of the grievance machinery will serve to immunize the whole enterprise. The parties cannot by contractual agreement divest the Board's function to operate in the public interest, and this is so regardless of whether the contractual agreement is reached by consent or through an arbitrator's construction. In spite of the Teamsters' contention that they "were only seeking to police their contract," we believe the unfair labor practice charges were sufficiently substantial to support a finding of reasonable cause.

## V. CONCLUSION

The substantive questions involved in these unfair labor practice charges are complex and to some degree novel, and nothing in this opinion should be read as a pre-judgment of these issues by the Court. To the extent that we have responded to many of the Teamsters' skilled arguments, we have done so only to show that the charges were "substantial." For that reason we have purposely not presented the Teamsters' arguments on the merits as fully as we might if we were called upon to decide the merits. To many it may seem that we have circumnavigated the globe when our conclusion was berthed nearby. We thought it appropriate, however, to launch beyond the surface calm and set sail upon the ocean deep with all the navigational aids we could glean, hopeful that in the future it will rarely be necessary to look beyond the broad harbors of § 10(j).

 Only if we are convinced that the Board could not find unfair labor practices on the underlying charges

---

19. As the Second Circuit has noted in a quite similar context:

"The National Labor Relations Act guarantees certain rights to employees, employers, bargaining representatives, and the public, and the Board is charged with protecting these interests. An Arbitrator is not. His function is to discern the intention of the parties to a contract, who have hired him to resolve their differences. The interests of third parties, such as an individual employee, a group of employees, or the public, are not his primary concern."

N.L.R.B. v. Horn & Hardart Co., 2 Cir. 1971, 439 F.2d 674, 678. *See generally* Meltzer, Ruminations About Ideology, Law, and Arbitration, 34 U.Chi.L.Rev. 545 (1967); Sovern, When Should Arbitrators Follow Federal Law?, in Arbitration and the Expanding Role of Neutrals (Proc. of 23rd annual meeting of Nat.Ac. of Arb., 1970).

should we reject a finding of reasonable cause. We recognize that our disposition involves considerable deference to the Regional Director's decision to petition for temporary relief, but we believe that § 10(j) mandates such deference. We merely hold that the defensive contentions of the Teamsters are not conclusive enough to render the General Counsel's theories insubstantial. A temporary injunction to preserve the status quo while protecting the Board's jurisdiction, granted at the behest of the Board, is a far cry from the type of labor injunctions that Congress so carefully limited in *Norris-LaGuardia* and has few if any of the evils normally connected with such injunctions. The District Court's order finding reasonable cause and granting § 10(j) relief is affirmed.

Affirmed.