724 F.2d 1109
 115 L.R.R.M. (BNA) 3143, 100 Lab.Cas. P 10,804
 Fred A. LEWIS, Regional Director of the Fifteenth Region of
the National Labor Relations Board, for and on
behalf of the National Labor Relations
Board, Plaintiff-Appellee,
v.
NEW ORLEANS CLERKS & CHECKERS, I.L.A. LOCAL NO. 1497, Etc.,
et al., Defendants-Appellants,
Carriers Container Council, Intervenor-Appellant.
 No. 83-3370.
 United States Court of Appeals,
Fifth Circuit.
 Jan. 12, 1984.
 
 Lambos, Flynn, Nyland & Giardino, C.P. Lambos, Donato Caruso, Nicholas G. Maglaras, and Thomas W. Gleason, Jr., Ernest L. Mathews, Jr., Herzl S. Eisenstadt, New York City, for N.O. Clerks & Checkers, McClelland, Internat'l Longshoremen's Assoc., Gen Longshore Workers, Columbus Lines, Inc., Bank Y Savil Lines.
 Walker & Bordelon, Alvin J. Bordelon, Jr., New Orleans, La., for NOSSA & Carriers.
 Hess & Washofsky, Dennis M. Angelico, Victor H. Hess, Jr., New Orleans, La., for N.O. Clerk, McClelland & Gen Longshore.
 Ernest Burguieres, Metairie, La., for N.O. Cold Storage.
 Joseph P. Norelli, James F. Allmendinger, N.L.R.B., Washington, D.C., for plaintiff-appellee.
 Appeal from the United States District Court for the Eastern District of Louisiana.
 Before WISDOM, REAVLEY and JOHNSON, Circuit Judges.
 JOHNSON, Circuit Judge:
 
 
 1
 Respondents appeal the district court's grant of a petition for a preliminary injunction filed on behalf of the National Labor Relations Board (the Board) pursuant to section 10(l ) of the National Labor Relations Act, 29 U.S.C. Sec. 160(l ) (the Act). This Court upholds the grant of the preliminary injunction.
 
 
 2
 On May 26, 1983, the Regional Director of the Fifteenth Region of the Board issued a consolidated complaint based upon unfair labor practice charges filed by New Orleans Cold Storage Co., Ltd. (NOCS) against the New Orleans Steamship Association (NOSSA), Columbus Lines, Inc. (Columbus), Bank & Savil Lines (Bank & Savil), New Orleans Clerks & Checkers, International Longshoremen's Association Local No. 1497 (Local 1497), James McClelland, President of Local 1497, the International Longshoremen's Association, AFL-CIO (ILA), and General Longshore Workers, ILA Local No. 3000 (Local 3000), collectively termed the respondents. The complaint alleged that the respondents were violating section 8(e) of the Act[1] by maintaining in effect and implementing with respect to NOCS the warehousing provisions of their collectively bargained rules on containers. The complaint further alleged that the ILA, Local No. 1497, Local 3000, and McClelland were violating section 8(b)(4)(ii)(B) of the Act[2] by coercing and restraining NOSSA, Columbus, and Bank & Savil to force them to comply with the Rules with regard to containers for NOCS. On May 27, 1983, the Regional Director filed a petition for a preliminary injunction which the district court granted on June 15. The court's order enjoined the respondents from applying the Rules to full shipment load containers of imported frozen meat and dairy products being shipped to NOCS until final disposition of the matters involved by the Board. The injunction, which maintained the status quo, was to prohibit the longshoremen from stripping (unloading) the containers on the piers. The respondents appeal from the court's grant of the preliminary injunction.
 
 
 3
 The instant case arose from the application of containerization technology to the shipping of fresh frozen meat from Australia and New Zealand to the Port of New Orleans. Before the introduction of containerized shipping, longshoremen loaded and unloaded cargo piece-by-piece (in break-bulk mode). Containers are large, reusable metal receptacles which are loaded at the point of origin and used for shipping, and which can be removed from ocean vessels unopened and transported intact to a location away from the pier for unloading. Since cargo was no longer handled piece-by-piece, the use of containers greatly reduced the work of longshoremen at the destination pier. Collective bargaining between the ILA and shipping association employers in East Coast and Gulf ports resulted in the Rules on containers. These Rules provide, in pertinent part, as follows:
 
 
 4
 [W]hen any containers owned or leased by a shipping company are to be loaded or unloaded within 50 miles of the port, these containers must be loaded or unloaded by ILA labor at the pier; however, there are several stated exceptions to this general 50-mile rule. Thus, under the 50-mile rule, the ILA does not claim: (1) the work of loading or unloading FSL containers (full shippers' loads) which are to be loaded or unloaded by the employees of the beneficial owner of the cargo, or (2) the work of unloading FSL containers which are to be warehoused for thirty days or more.... The Rules require a shipping company to pay liquidated damages of $1,000 per container for any container handled in violation of these provisions.
 
 
 5
 International Longshoremen's Association, 266 N.L.R.B.No. 1983 54, NLRB Mar. (CCH) p 15,624 at 26,672 (1983) (hereinafter ILA or the ILA case). Specifically, the instant case involves the attempt by the unions to apply the Rules to refrigerated containers (reefers) destined for the NOCS warehouse, located within the fifty-mile scope of the Rules, when the fresh frozen meat in the reefers will remain warehoused for less than thirty days.
 
 
 6
 A certain amount of history pertinent to the Rules is helpful to an understanding of the instant case. In International Longshoremen's Association, 236 N.L.R.B. 525 (1978), vacated and remanded, 613 F.2d 890 (D.C.Cir.1979), aff'd, 447 U.S. 490, 100 S.Ct. 2305, 65 L.Ed.2d 289 (1980), the Board determined that the Rules were an unlawful work acquisition agreement as opposed to a lawful work preservation agreement--they represented an attempt to acquire work which the union members had never performed previously. The court of appeals for the District of Columbia Circuit found that the Board had improperly defined the "work in controversy." International Longshoremen's Association v. N.L.R.B., 613 F.2d 890 (D.C.Cir.1979), aff'd, 447 U.S. 490, 100 S.Ct. 2305, 65 L.Ed.2d 289 (1980). The Supreme Court affirmed and remanded the case to the Board for a proper determination of the work in controversy. N.L.R.B. v. International Longshoremen's Association, 447 U.S. 490, 100 S.Ct. 2305, 65 L.Ed.2d 289 (1980). On remand the Board found that "the proper emphasis is on the traditional work of the longshoremen and what has happened to that work" and defined the work in controversy as "the initial loading and unloading of cargo within fifty miles of a port into and out of containers owned or leased by shipping lines having a collective bargaining relationship with the ILA." ILA, 1983 NLRB Mar. (CCH) p 15,624 at 26,675 & 26,676 (1983). The Board further found, however, that the Rules had an unlawful work acquisition objective with respect to the application of the thirty day provision to certain traditional warehousing services. The basis of the Board's decision was that the efficiency of technology had eliminated the duplicative work of the longshoremen in handling cargo which has been rehandled by truckers and warehouses, i.e., that the work of the longshoremen no longer existed as a step in the cargo-handling process. Id. at 26,676. The Board's decision is presently on appeal to the Fourth Circuit. Following the Board's decision in the ILA case,[3] which generally upheld the Rules, they were reimplemented on April 18, 1983, by agreement of the ILA and the employer associations.
 
 The Current Dispute
 
 7
 Prior to late 1972, when refrigerated containers first began to arrive in the Port of New Orleans, frozen cooked meat was received in break-bulk mode and was unloaded from the ships by ILA labor in traditional stevedoring fashion. The longshoremen removed the packages of frozen meat from the refrigerated hold of the ship and placed them on pallets. Winches were used to remove the pallets to the wharf and forklifts were used to move the pallets to a shed for counting. The longshoremen then loaded the cargo onto trucks for delivery either to NOCS refrigerated warehouses or directly to consignees. NOCS employees unloaded the trucks and moved the packages into the warehouse.
 
 
 8
 When reefers of fresh frozen meat from New Zealand and Australia began to arrive in the Port of New Orleans in 1972, the loaded containers were removed from the ships by cranes, operated by ILA labor, and placed on trucks. During the period from 1972 until April 1983, various court decrees restrained implementation of the Rules and therefore longshoremen did not strip the reefers on the pier. The unopened containers were delivered to the NOCS warehouse where NOCS employees stripped them, i.e., removed the individual boxes of frozen meat from each container, stacked the boxes on pallets, and separated boxes for inspection. NOCS could not always determine prior to the arrival of the containers how long the meat would be stored, but at least seventy-five percent was warehoused for less than thirty days.
 
 
 9
 Following the Board's ILA decision and reimplementation of the Rules, all local unions were advised by the international union that the Rules on containers were to be enforced to the fullest extent permitted by the Board's decision. Meetings which were held between representatives of Locals 3000 and 1497 and NOSSA management resulted in the Unions' assertion of their rights to file grievances and seek the liquidated damages penalty for any violations of the Rules. On April 26, twenty-six reefers of meat destined for NOCS were, at the direction of Columbus Lines, stripped on the pier by ILA labor. Columbus Lines gave this direction out of a fear that failure to permit ILA labor to strip the containers on the pier would result in a $1000 per container penalty. All such containers had previously been removed from the ships by the longshoremen and delivered directly to the NOCS warehouse where they were stripped by NOCS employees. On April 27, approximately half of the sixty reefers of meat arriving on a Bank & Savil Lines ship were stripped on the dock by ILA labor. Bank & Savil had received information that the local Rules committee had concluded that delivery to NOCS without stripping on the dock by ILA labor would violate the Rules and thereby subject Bank & Savil to the liquidated damages penalty. NOCS filed unfair labor practice charges with the Board as a result of the application of the Rules to the import full shipper loads of frozen meat which were destined for its warehouse. The Regional Director issued a consolidated complaint based on these charges. Pursuant to section 10(l ) of the Act, he asked the district court for a preliminary injunction pending the Board's resolution of the charges. The court found that there was reasonable cause to believe that sections 8(e) and 8(b)(4) of the Act had been violated and entered an order enjoining the respondents from applying the Rules to full shipment load containers of imported frozen meat and dairy products being shipped to the NOCS warehouse until final disposition of the unfair labor practice charges by the Board.
 
 Jurisdiction
 
 10
 The respondents contend that the district court was without jurisdiction to grant a section 10(l ) injunction. They reason that a section 10(l ) injunction may be granted only during the preliminary investigation of a section 8(e) or (8)(b)(4) charge and this case is not in a preliminary stage because the issues raised herein have been finally adjudicated by the Board in the ILA case and are presently on appeal to the Fourth Circuit. Accordingly, the Fourth Circuit would have exclusive jurisdiction of this case pursuant to sections 10(e) and 10(f) of the Act and the application for injunctive relief should have been made to the Fourth Circuit. This argument is wholly without merit. The instant case, although it involves similar issues to the ILA case, concerns a different employer, different local unions, and a different factual context. The legality of the application of the thirty-day warehousing rule to the instant factual setting is a separate and distinct case from the legality of the Rule in other factual contexts. The crucial fact issue in this case--whether the longshoremen are taking over work that had been done in the past by NOCS employees--depends on evidence developed in the district court regarding NOCS' warehousing tradition in the Port of New Orleans. Furthermore, a court of appeals could not have jurisdiction over the instant case pursuant to sections 10(e) and (f). These sections give courts of appeals jurisdiction to grant temporary relief pending enforcement of a Board order. In this case, the Board has not yet issued an order; accordingly, there is nothing the Board can seek to enforce in a circuit court. Cf. Pascarell v. New York Shipping Association, 650 F.2d 19 (3d Cir.) [section 10(e) does not authorize relief when the Board's order has been vacated], cert. denied, 454 U.S. 832, 102 S.Ct. 130, 70 L.Ed.2d 110 (1981). Here, the Regional Director had a mandatory duty to seek injunctive relief in the appropriate district court pursuant to section 10(l )[4] and the district court clearly had section 10(l ) authority to grant the requested temporary relief.
 
 The Section 10(l) Preliminary Injunction
 
 11
 Section 10(l ) of the Act authorizes the district court to grant preliminary injunctive relief pending the Board's final resolution of the particular unfair labor practice charges, here, violations of sections 8(e) and 8(b)(4). Section 10(l ) imposes a duty on the Board's Regional Director to seek injunctive relief when he has "reasonable cause" to believe the charges and authorizes the district court to grant the temporary relief "as it deems just and proper."[5] Section 10(l ) injunctive proceedings are ancillary to the main unfair labor practice case and any injunction issued thereunder expires when the Board renders its final decision in the underlying unfair labor practice proceeding.
 
 
 12
 In deciding whether to grant a section 10(l ) injunction, the district court is not to determine whether an unfair labor practice has in fact been committed but simply to determine whether there is reasonable cause to believe that a violation of the Act has occurred. Baldovin v. International Longshoremen's Association, 626 F.2d 445, 454 (5th Cir.1980). If there is a reasonable basis upon which the Regional Director would be able to sustain his charge before the Board, the "reasonable cause" standard is satisfied. Id. A reasonable basis exists if the Regional Director's legal theory of violation is not insubstantial or frivolous. Boire v. International Brotherhood of Teamsters, 479 F.2d 778, 792 (5th Cir.1973). In reviewing the district court's finding that reasonable cause exists to believe the unfair labor practice charges are true, this Court must inquire into the substantiality of the Regional Director's theories--not into their correctness.[6] Id. at 793. Only if this Court is convinced that the Board could not find unfair labor practices on the underlying charges should it reject a finding of reasonable cause. Id. at 803-04. This Court has opted for this deferential, "nonactive" approach in the review of the grant of a preliminary injunction under section 10(l ) because the legal questions are thereby preserved for the forum--the Board--that Congress has designated as best qualified to pass upon the charged violations. Id. at 792.
 
 
 13
 The district court found reasonable cause to believe that the Rules, as applied in this context, constituted an unlawful work acquisition agreement violative of section 8(e) and that the enforcement of the Rules by the unions against NOCS constituted an unlawful secondary boycott violative of section 8(b)(4)(ii)(B).[7] We can only reject the district court's finding of reasonable cause if this Court is convinced that the Board could not find unfair labor practices based on the underlying charges. We cannot reach that conclusion on the facts of the instant case. In its ILA decision, the Board found that longshoremen had traditionally performed the work of loading, unloading, checking, and sorting cargo for short-term warehouse storage. The Board further found that some of this short-term warehousing work was diverted away from the pier after containerization and that the thirty-day rule was a rational attempt to distinguish between short-term storage at a marine terminal warehouse and long-term storage at an inland public warehouse. Nonetheless, the Board found that in certain cases, some of the indefinite, short-term warehousing work claimed by the longshoremen under the Rules was performed by warehouse employees as a necessary incident of traditional warehousing services. In these cases, no work was diverted away from the pier, but rather some of the traditional work of longshoremen, historically duplicated by warehousing employees, was eliminated. In such cases, the application of the Rules would constitute an unlawful work acquisition agreement. The Board's decision therefore requires that the facts of each case be analyzed to determine whether the warehouse employees are performing "traditional warehousing services" and whether the duplicative work of the longshoremen has been eliminated by modern technology. The record indicates that NOCS had provided both short-term and long-term cold storage warehousing of imported frozen meat in the Port of New Orleans before the advent of containerization. In addition, both before and after containerization NOCS employees unloaded frozen meat cargo transported from the port and checked and stored the meat. It is not impossible that on the facts of this case the Board could find that the piecemeal unloading formerly done by the longshoremen has been eliminated, that NOCS provides traditional warehousing services, and that no work has been diverted away from the pier to NOCS by containerized technology.[8]
 
 
 14
 Respondents argue that no reasonable cause exists to believe that the Rules as applied here violate section 8(e) because the Regional Director failed to establish that NOCS had a warehousing tradition and was not merely a "drop point" for stripping the containers. Such a showing is not required, however, to support a finding of reasonable cause. The evidence concerning the warehousing of meat at NOCS was sufficient to present a factual question as to whether NOCS provided traditional warehousing services. The district court did not have to resolve this factual issue in order to support a reasonable cause finding. Indeed, it would have been inappropriate for it to do so, as the ultimate determination of factual issues is reserved for the Board after a full hearing. Id. at 791. Respondents also contend that the ILA case is wrongly decided and cannot therefore support a finding of reasonable cause. In so arguing, respondents misperceive the essential task of this Court. Our sole inquiry is into the substantiality of the Regional Director's legal theory supporting a violation. We will not inquire into the correctness of that theory or into the merits of the principles enunciated in that case. Given the Board's decision in the ILA case, this Court cannot deem the Regional Director's legal theory insubstantial or frivolous. We therefore uphold the district court's finding of reasonable cause to believe a violation existed.
 
 
 15
 The statute authorizes the district court to grant temporary relief as it deems "just and proper." The determination whether to grant equitable relief is left to the discretion of the district court; this Court will only reverse the grant of relief if it finds an abuse of discretion. Id. at 793. The district court found that an injunction was a "just and proper" remedy in this case because upsetting the status quo would likely result in irreparable harm to NOCS and in "substantial interruption in the smooth and orderly flow and government inspection" of the imported frozen meat to NOCS. The harm to NOCS consisted in the probable diversion of shipments of frozen meat from the Port of New Orleans to other United States ports where the Rules are not part of a collective bargaining agreement. This finding is supported by testimony from respondents' own witnesses. The arguments made by respondents that a preliminary injunction is not a "just and proper" remedy in this case are not sufficient to support a finding that the district court abused its discretion in granting temporary relief.[9] The district court's grant of section 10(l ) relief is affirmed.
 
 
 16
 AFFIRMED.
 
 
 
 [1]
 Section 8(e) of the Act proscribes secondary boycotts obtained by strikes, threats, or coercion. The section makes it an unfair labor practice for a labor organization and an employer
 to enter into any contract or agreement, express or implied, whereby such employer ceases or refrains or agrees to cease or refrain from handling, using, selling, transporting or otherwise dealing in any of the products of any other employer, or to cease doing business with any other person, and any contract or agreement entered into heretofore or hereafter containing such an agreement shall be to such extent unenforcible and void ...
 29 U.S.C. Sec. 158(e).
 
 
 [2]
 Section 8(b)(4)(ii)(B), the "secondary boycott" provision of the Act prohibits contractual arrangements by which an employer agrees to engage in the secondary boycott. The section makes it an unfair labor practice for a labor organization or its agents
 (ii) to threaten, coerce, or restrain any person engaged in commerce or in an industry affecting commerce, where in either case an object thereof is--
 * * *
 (B) forcing or requiring any person to cease using, selling, handling, transporting, or otherwise dealing in the products of any other producer, processor, or manufacturer, or to cease doing business with any other person .... Provided, That nothing contained in this clause (B) shall be construed to make unlawful, where not otherwise unlawful, any primary strike or primary picketing.
 29 U.S.C. Sec. 158(b)(4)(ii)(B).
 
 
 [3]
 The Board's decision was issued on February 28, 1983
 
 
 [4]
 Section 10(l ) states that if the regional attorney has reasonable cause to believe that the unfair labor practice charge is true, he "shall" petition the district court
 
 
 [5]
 Section 10(l ) provides, in pertinent part, as follows:
 Whenever it is charged that any person has engaged in an unfair labor practice within the meaning of paragraph (4)(A), (B), or (C) of section 158(b) of this title, or section 158(e) of this title or section 158(b)(7) of this title, the preliminary investigation of such charge shall be made forthwith and given priority over all other cases except cases of like character in the office where it is filed or to which it is referred. If, after such investigation, the officer or regional attorney to whom the matter may be referred has reasonable cause to believe such charge is true and that a complaint should issue, he shall, on behalf of the Board, petition any United States district court within any district where the unfair labor practice in question has occurred, is alleged to have occurred, or wherein such person resides or transacts business, for appropriate injunctive relief pending the final adjudication of the Board with respect to such matter. Upon the filing of any such petition the district court shall have jurisdiction to grant such injunctive relief or temporary restraining order as it deems just and proper, notwithstanding any other provision of law....
 29 U.S.C. Sec. 160(l ).
 
 
 [6]
 Of course, the factual findings of the district court, e.g., what happened, are reviewable under the clearly erroneous standard. Boire, 479 F.2d at 793
 
 
 [7]
 The focus of the "reasonable cause" finding is on Sec. 8(e)--whether the Rules as applied have a lawful work preservation objective or whether they have a secondary work acquisition objective. The respondents admit that the ILA and its locals pressured NOSSA, Columbus, and Bank & Savil to comply with the Rules with respect to containers destined for NOCS by threats of fines and grievances pursuant to the Rules. Accordingly, if the Rules as applied violated Sec. 8(e), the threats violated section 8(b)(4)(ii)(B)
 
 
 [8]
 On September 8, 1983, the administrative law judge (ALJ) issued an order and decision finding that the respondents committed substantially the same unfair labor practices which the district court found reasonable cause to believe had occurred. The ALJ's decision is, of course, subject to review by the Board
 
 
 [9]
 Respondents assert that the stripping of containers is an insignificant factor in the overall transportation system and thus implementation of the Rules will not interrupt the free flow of commerce; that denial of an injunction will not cause any shipments to be diverted to other ports because all the eastern seaboard is governed by the Rules; that an injunction is not required to preserve Board jurisdiction because identical issues were addressed in the ILA case; that an injunction will interfere with collective bargaining; and that longshoremen will be irreparably harmed rather than NOCS